## Fred S. BENDINGER *v.* MARSHALLTOWN TROWELL COMPANY

98-611 994 S.W.2d 468

Supreme Court of Arkansas
Opinion delivered July 15, 1999

[Petition for rehearing denied September 9, 1999.]

*Pettus Law Firm, P.A.*, by: *Donna C. Pettus*, for appellant.

*Davis, Cox & Wright*, by: *Constance G. Clark* and *William Jackson Butt, II*, for appellee.

TOM GLAZE, Justice. This case involves an action alleging a violation of the Arkansas Trade Secrets Act, Ark. Code Ann. §§ 4-75-601 *et seq.* (Repl. 1996), and, alternatively, a violation of a covenant not to compete, both claims arising from Fred S. Bendinger's employment contract with Marshalltown Trowel Company ("Marshalltown"). The chancellor enforced the restrictive covenant, thereby prohibiting Bendinger from working for Marshalltown's competitor, Kraft Tool Company, for two years. Nonetheless, the chancellor refused to permanently enjoin Bendinger under the Act from employment with Kraft or any other competitor. Both parties appealed the chancellor's order to the Arkansas Court of Appeals, which certified the case to us because it presents an issue of first impression that is of significant interest in an area in need of clarification. We accepted jurisdiction to decide the merits of the appeal. Ark. Sup. Ct. R. 1-2(b)(1), (4)-(6) and (d) (1999).

We first offer a recitation of the facts needed for determination of the questions presented to the court. Marshalltown is an Iowa corporation with its principal place of business in Fayetteville, Arkansas. Its primary trade is the production and sale of trowels and related merchandise. Bendinger is an industrial engineer who was hired to work for Marshalltown beginning July 15, 1970, when he graduated from college in Iowa. When he began his employment, no written employment document was executed, but on March 22, 1978, at Marshalltown's request, he signed the following agreement:

> Without [Marshalltown's] prior written consent, [Bendinger] shall not use or disclose at any time, either during or subsequent to his employment hereunder, any secret or confidential informa-

tion, whether patentable or not, which is disclosed or known to [Bendinger], as a consequence of his said employment except as may be required in the performance of [Bendinger's] duties to [Marshalltown].

[Bendinger], shall not, for a period of two years following the termination of [his] employment with [Marshalltown], directly or indirectly render service to a business competitor of [Marshalltown].

On October 22, 1984, after Marshalltown expanded its business facilities and opened a new plant in Fayetteville whose construction Bendinger was transferred to oversee, Bendinger was asked to execute a second employment agreement. That agreement contains provisions identical to the 1978 agreement set out above, and provided that it is to be construed in accordance with Arkansas law.

In 1993, Marshalltown advised Bendinger by memoranda that he was being replaced as factory manager and being demoted to the position of facilities manager. His demotion was purportedly due to his lack of motivation and imagination, as well as his inability to deal effectively with those employees he supervised. Also at this time, Marshalltown was consistently failing to meet its delivery objectives. Displeased with Marshalltown's actions, Bendinger began looking for other employment opportunities. He responded to a blind newpaper advertisement in the *Northwest Arkansas Times*. The ad, placed by Kraft Tool Company of Kansas, sought an individual highly qualified in the manufacturing of hand tools.

Bendinger told Kraft of his restrictive employment agreement with Marshalltown, and eventually notified Marshalltown of his job search efforts. Marshalltown reacted by refusing to release Bendinger from his employment agreement. He was given three options: (a) stay with Marshalltown and seek counseling; (b) look for an outside position for which Marshalltown would reimburse him up to $15,000 for out-placement services and expenses within one year of his departure; or (c) take the position with Kraft, but if

he did, Marhsalltown would go to court to enforce the parties' restrictive covenant. On April 17, 1997, Bendinger took the third option and resigned from Marshalltown, and the following day, he entered into an oral employment agreement with Kraft to serve as its plant manager. Upon taking the job with Kraft, both Bendinger and Kraft sued for declaratory judgment in the District Court of Johnson County, Kansas, and asked the Kansas court to declare Bendinger's restrictive-covenant agreement void.[1]

In response, Marshalltown filed suit against Bendinger and Kraft in the Washington County Chancery Court, seeking enforcement of the parties' two-year restrictive covenant, and also alleging that Bendinger's misappropriation of Marshalltown's trade secrets should be held a violation of the Arkansas Trade Secrets Act. On April 28, 1997, Marshalltown obtained an ex parte temporary restraining order (TRO) enjoining Bendinger from working at Kraft. As a condition for granting the TRO, the chancellor directed Marshalltown to post a bond in the amount of $1,000 and, in lieu of an additional bond, Marshalltown was to continue to pay Bendinger his regular pay through May 31, 1997. An emergency hearing was then conducted, and Marshalltown requested that the proceeding be conducted *in camera* so as to avoid disclosing its confidential information to Kraft. The court declined Marshalltown's request, so Marshalltown voluntarily dismissed Kraft from the lawsuit.[2] After the hearing, the chancellor set aside the TRO and allowed Bendinger to work for Kraft, but imposed a protective order on the parties to secure Marshalltown's proprietary information.

The matter proceeded to trial in August 1997. On September 2, 1997, the chancellor issued his decree, denying Marshalltown's request for a permanent injunction under the Trade Secrets Act because the proof was insufficient to show that either Bendinger or Kraft misappropriated Marshalltown's trade secrets.

---

[1] Apparently the Kansas proceeding is still pending.

[2] Kraft later moved to intervene, which the chancellor permitted by order entered on June 18, 1997.

Nonetheless, the chancellor found Marshalltown's and Bendinger's restrictive covenant enforceable, and directed that Bendinger could not work for Kraft or any other competitor for a period of two years, commencing from the date of the chancellor's decree. Both parties moved to amend the judgment, but the court refused to amend its decree, except it did award Marshalltown attorney's fees of $12,000 under Ark. Code Ann. § 16-22-308 (Repl. 1996) for prevailing on its covenant-not-to-compete claim.

As previously mentioned, both parties have appealed from the chancellor's rulings. Bendinger and Kraft submit that the chancellor erred in enforcing the restrictive covenant and in awarding Marshalltown attorney's fees. Marshalltown cross-appeals wherein it argues that the chancellor erred in refusing to find misappropriation under the Trade Secrets Act, in failing to conduct an *in camera* hearing on the TRO, and in not requiring Bendinger to repay Marshalltown the salary monies Marshalltown had been directed to pay Bendinger in lieu of TRO bond money. We now turn to a discussion of the merits of the appeal.

Bendinger first claims that the chancellor erred in his interpretation and application of the law relating to the enforcement of the restrictive covenant. Specifically, Bendinger submits that it was error to uphold the contract, as the chancellor found no proof of either actual or threatened misappropriation of Marshalltown's trade secrets by either Bendinger or Kraft. In support of this argument, Bendinger insists that Arkansas courts have never upheld a covenant not to compete where the employee has not engaged in some act to harm his former employer or where the new employer has not already benefitted from an unfair competitive advantage. Bendinger argues that the rule in Arkansas is that where the former employee has not in some way either used or disclosed secret information or evidenced a clear intent to do so, Arkansas courts have consistently refused to uphold covenants not to compete.[3]

---

[3] While we dispose of the appeal on Bendinger's alternative argument, we note that the rule he proposes is more expansive than that recognized by Arkansas courts. Where a

Alternatively, Bendinger argues that the contract is not enforceable since it failed to contain a reasonable geographic limitation.

■ Noncompetition clauses in employment contracts have been the source of litigation for over 500 years. *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D. Iowa 1995) (citations omitted). Under early English common law, courts were hostile to employee covenants not to compete and regarded them as contrary to public policy. *Id.* at 1256. For at least 250 years, the most cited case on common-law restraints of trade has been *Mitchel v. Reynolds*, 1 P.Wms. 181, 24 Eng.Rep. 347 (Q.B. 1711), which sought a unifying principle to guide judicial decisions in all subsequent cases involving enforcement of a covenant not to compete. *Id.* In that case, Lord Maclesfield noted that there was a presumption that all restraints of trade are invalid, but nonetheless held that the presumption could be overcome. *Id.* (quoting *Mitchel v. Reynolds*, 1 P.Wms. at 182, 24 Eng.Rep. at 348-349). The presumption is overcome by a showing of reasonableness. Thus, it has become equally well-established that *reasonable* post-employment restrictive covenants are not in restraint of trade. Roger M. Milgrim, Milgrim On Trade Secrets § 4.02[1][d][v] at 4-64 (1999) (emphasis provided).

■ Arkansas has followed the trend in this area by requiring a party challenging the validity of a covenant to show that it is unreasonable and contrary to public policy. *Dawson v. Temps Plus, Inc.* 337 Ark. 247, 987 S.W.2d 722 (1999). Without statutory authorization or, some dominant policy justification, a contract in restraint of trade is unreasonable if it is based on a promise to refrain from competition that is not ancillary to a contract of employment or to a contract for the transfer of goodwill or

covenant not to compete grows out of an employment relationship, courts have found an interest sufficient to warrant enforcement of the covenant where the associate is *able to use* information obtained from his former employer's special training, trade secrets, confidential business information or customer lists to gain an unfair competitive advantage. *See Federated Mut. Ins. Co. v. Bennett*, 36 Ark. App. 99, 818 S.W.2d 596 (1991) (emphasis provided); see also *Orkin Exterminating Co., Inc. v. Weaver*, 257 Ark. 926, 521 S.W.2d 69 (1975); *Rector-Phillips-Morse, Inc. v. Vroman*, 253 Ark. 750, 489 S.W.2d 1 (1973).

other property. However, the law will not protect parties against ordinary competition. *Id.* This court has recognized that covenants not to compete in *employment* contracts are subject to stricter scrutiny than those connected with a *sale of a business.* We review cases involving covenants not to compete on a case-by-case basis. *Id.* Furthermore, the court reviews chancery cases *de novo* and does not reverse a finding of fact by the chancery court unless it is clearly erroneous. *Saforo & Assoc. Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

We hold that the failure of the covenant to contain a geographic restriction in this case renders it overbroad. In its brief, Marshalltown contends that the failure to supply a geographic restriction was reasonable since Marshalltown competes with Kraft on a nationwide basis and because Marshalltown has established an international market. In support of its contention, Marshalltown points to cases where courts have upheld restrictive covenants even though they contained no geographic limitation. Those cases show that where a company is actually engaged in nation-wide activities, nation-wide protection would appear to be reasonable and proper. *See, e.g., Harwell Enterprises, Inc. v. Heim*, 276 N.C. 475, 173 S.W.2d 316 (1970). Accord *Sigma Chemical Company v. Harris*, 794 F.2d 371 (8th cir. 1986) (enforcing restrictive covenant lacking a geographical limitation based on Missouri law which permits enforcement where the breach occurs within an area in which the restriction would be clearly reasonable, even though the terms of the agreement impose a larger and unreasonable restraint). Marshalltown also directs us to *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985), and argues that the analysis made in that case should equally apply here. There, the court of appeals upheld a covenant not to. compete even though it lacked a geographic limitation.

During oral argument, Marshalltown clarified its position and explained its restrictive covenant banned Bendinger from

working for any company it considered a "competitor." Marshalltown defines "competitor" as "any company in the trowel industry that is in competition with Marshalltown for sales in the United States, regardless of where that company is located." Marshalltown suggests that the use of the word "competitor" in its agreement with Bendinger supplies a sufficient geographic restriction which this court should uphold, but that term as Marshalltown wishes to define it is not contained in the covenant, and we are unable to rewrite the restrictive covenant to supply it. The court has held that the contract must be valid as written, and the court will not apportion or enforce a contract to the extent that it might be considered reasonable. *Borden v. Smith*, 252 Ark. 295, 478 S.W.2d 744 (1972) (citing *McLeod v. Meyer*, 237 Ark. 173, 372 S.W.2d 220 (1963)). In *Borden*, the court cited to the *McLeod* decision with approval for the rule that the court would not vary the terms of a written agreement between the parties; to do so would mean that the court would be making a new contract and it has consistently held that this will not be done. *Id.* at 300, 478 S.W.2d at 747. We point out that it is because of the rule expressed in *Borden* that the *Harwell* decision and the *Sigma Chemical Company* decision, referenced above, are not applicable. In *Harwell*, the covenant expressly contained a nation-wide limitation. 173 S.E.2d at 318, 320. Whereas, in *Sigma Chemical Company*, the Eighth Circuit Court of Appeals applied Missouri state law which permitted the issuance of injunctive relief to the extent reasonable, despite the fact that the agreement itself contained a larger, unreasonable restraint. 794 F.2d at 374. Accordingly, we decline to vary the terms of Bendinger's employment agreement.

■ We also view this case to be factually distinguishable from *Girard*. There, the restrictive covenant was self-limiting in that it prohibited Girard from soliciting or accepting any insurance business on any account which Girard was servicing for Rebsamen Insurance Company at the time of his departure. 14 Ark. App. at 156, 685 S.W.2d at 527. While the agreement contained no specific geographic restriction, the court of appeals explained that the failure to supply one did not render the agreement overbroad,

since Girard was not forced to go elsewhere to open his own insurance business, and was free to solicit and accept business from 95% of the overall insurance market at his present location. *Id.* at 159, 685 S.W.2d at 529. In fact, Girard was free to solicit and accept business from 80% of the customers of the insurance company's office. *Id.* In this case, there is no similar inherent limitation in Bendinger's employment agreement with Marshalltown, and we do not agree that the term "competitor," by itself, provides a reasonable restriction. Unlike the employee in *Girard*, Bendinger is precluded from *any* work within the trowel industry under Marshalltown's definition of "competitor." Accordingly, we believe that the chancellor clearly erred in finding that the failure of the parties' restrictive covenant to contain a geographic limitation was reasonable. Therefore, we reverse the chancellor's order because the employment agreement is overbroad.[4]

We next turn to Marshalltown's cross-appeal where it challenges the chancellor's denial of injunctive relief under the Arkansas Trade Secrets Act, since this issue may have merit independent from our decision not to enforce the restrictive covenant. The chancellor below found Marshalltown possessed the following four trade secrets: (a) a customer list; (b) a vendor list; (c) a permashaped trowel blade; and (d), a fourth shift system (computerized manufacturing system). Despite the existence of the trade secrets, the chancellor expressly determined that there was no proof that either Bendinger or Kraft would misappropriate the confidential information. Marshalltown submits that Bendinger's employment with Kraft will result in the inevitable disclosure of such information. Marshalltown points out that a number of courts have found that where an employee's knowledge and skills are inextricably tied up with his employer's trade secrets and the subsequent employment poses a substantial risk that the first employer's trade secrets will be used, such inevitable disclosure

---

[4] By this decision we do not hold that every restrictive covenant that fails to contain a geographic restriction is unreasonable. *E.g., Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985). Each case is governed by its facts, and in this case, the facts simply do not warrant upholding the covenant at issue.

will justify an injunction against the competitive employment. *See* MILGRIM ON TRADE SECRETS, *supra* at § 5.02[3][d]. Marshalltown maintains that there is evidence, then, of the *threat* of misappropriation of its trade secrets based on the inevitability of disclosure, which it submits is actionable under Ark. Code Ann. § 4-75-604(a).

■ Recently, this court adopted the inevitable-disclosure rule in *Cardinal Freight Carriers v. J.B. Hunt Transportation Service.* 336 Ark. 143, 152, 987 S.W.2d 642, 646. In that case, we recognized that a number of federal cases dealing with trade secrets have held that a plaintiff may prove a claim of trade-secrets misappropriation by demonstrating that a defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. *Id.* (citing *Pepsico, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir. 1995); *AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1206-1207 (7th Cir. 1987); *Teradyne, Inc. v. Clear Communications Corp.,* 707 F. Supp. 353 (N.D. Ill. 1989)). Because we have adopted the inevitable-disclosure rule, the only question to resolve is whether Bendinger's employment with Kraft will result in a situation where Bendinger will inevitably rely on Marshalltown's trade secrets. After considering the evidence and testimony before the chancellor, we cannot hold he was clearly erroneous in finding that there is no evidence of any actual, threatened, or inevitable misappropriation under § 4-75-604.

Larry McComber, Marshalltown's president, testified that Bendinger's answers to certain interrogatories showed how Bendinger could not avoid incorporating his special knowledge of Marshalltown's sale information and manufacturing processes into his work with Kraft. In other words, McComber urged that Bendinger would be constantly using the knowledge and experience gained at Marshalltown as a reference for his work with Kraft. Other witnesses, including some employees of Kraft, testified that Bendinger chairs daily morning and afternoon production meetings during which employees discuss engineering matters relating to product quality, equipment problems, and changes in manufacturing processes. During these daily meetings, Marshalltown

insists Bendinger will be exposed to issues relating to his engineering background and will inevitably result in Bendinger divulging Marshalltown's trade secrets to Kraft.

On the other hand, Bendinger testified that he had only a general working knowledge of Marshalltown's machines and processes, and that he did not have in his possession any of the company's machine designs or blueprints. Bendinger candidly requested "guidance" from the chancellor as to what was Marshalltown's proprietary information so that he could avoid violating the parties' employment agreement. Bendinger also offered testimony that Kraft circulated a memo pertaining to Bendinger's employment detailing his personal situation and instructed employees that Bendinger was not to be consulted in relation to his prior employment with Marshalltown. In the end, the chancellor found Bendinger's testimony believable, specifically stating in his decree that Bendinger appeared to be an "honest, honorable person who respects Marshalltown's rights to protect its trade secrets." The chancellor also determined that Bendinger had some knowledge of Marshalltown's trade secrets, but that knowledge was "minimal at best," and that Bendinger lacked access to Marshalltown's customer and vendor lists, its blueprints, machine and product drawings, secret formula, or any other written information or material. In the chancellor's judgment, Bendinger's vast *general* knowledge of the trowel industry, as opposed to his engineering expertise, was of far greater value to Kraft than any knowledge of the four trade secrets he purportedly had.

We support the chancellor's conclusion, for a finding of inevitable disclosure is determined largely by the evidence and testimony before the chancellor. Given the fact that we review a chancellor's findings according to the clearly erroneous standard, we cannot say that the chancellor in this case erred in determining that there was no proof of actual, threatened, or inevitable misappropriation. The chancellor correctly relied on *AMP, Inc. v. Fleischhacker* in recognizing that the mere fact a person assumes a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secrets. 823

F.2d at 1202. While Bendinger has assumed a position with a competitor of Marshalltown's, that position is managerial in nature and does not require him to use his engineering expertise. So, Bendinger has not even assumed a *similar position* which would render the disclosure of Marshalltown's trade secrets inevitable. We also note, as did the Seventh Circuit Court of Appeals in *AMP, Inc.*, that the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. *Id.* (citing *ILG Industries v. Scott*, 49 Ill.2d 88, 93-94, 273 N.E.2d 393, 396 (1971)). Our society is extremely mobile and our free economy is based upon competition; one who has worked in a particular field cannot be compelled to erase from his mind all of the *general* skills, knowledge and expertise acquired through his experience. *Id.* (emphasis provided). Restraints cannot be lightly placed upon an employee's right to compete in the area of his greatest worth. *Id.* Because Bendinger is only using his *general* knowledge gained through his education and his twenty-seven years of experience in the trowel industry, he poses no threat to Marshalltown's trade secrets. For these reasons, we affirm the chancellor's refusal to issue Marshalltown an injunction permanently enjoining Bendinger from working for Kraft or any other competitor.

The disposition of the above two claims controls the outcome of the remaining arguments on appeal. First, since we conclude that the chancellor erred in enforcing the restrictive covenant, Marshalltown is no longer the prevailing party and entitled to attorney's fees under Ark. Code Ann. § 16-22-308 (Repl. 1996). Hence, the attorney's fee award of $12,000 to Marshalltown must be reversed. For similar reasons, Marshalltown's contention that the chancellor erred in refusing to direct Bendinger to repay Marshalltown the $1,727.40 in salary it expended in lieu of the TRO bond money need not be addressed. The April 28, 1997 TRO relied on by Marshalltown provided that the company could recover its bond money and salary paid to Bendinger "if it prevails on the merits." Since we hold that the restrictive covenant is unreasonable, and because we affirm the chancellor's

determination that no violation of the Arkansas Trade Secrets Act occurred, Marshalltown has not "prevailed on the merits" of its claim, and its argument is therefore moot.

 The only claim remaining is Marshalltown's assertion that the trial court erred in refusing to conduct the hearing on the preliminary injunction *in camera* so as to exclude Kraft's representatives from the courtroom. Marshalltown argued below, and continues its assertion on appeal, that the court was required to hold an *in camera* hearing so as to preserve the secrecy surrounding its alleged trade secrets pursuant to Ark. Code Ann. § 4-75-605 (Repl. 1996). This argument, too, is moot, considering our holdings in this case. Furthermore, Marshalltown cites no authority showing that the failure to conduct such a hearing *in camera* constitutes reversible error. In fact, Marshalltown concedes that the decision to hold an *in camera* proceeding under the statute is discretionary with the chancellor, and the cases it does direct the court to support such a conclusion. *See Air Products and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1129 (Pa.Super. 1982). We are inclined to agree. We also find that the substantial steps taken by the chancellor in this case adequately protected Marshalltown's trade secrets and fully complied with § 4-75-605. For example, the court allowed each party to designate "confidential" information which could then only be used for the purpose of litigation and could not be revealed or disclosed except to the court, the parties' counsel, and others specifically designated. Additionally, the court issued a temporary injunction which enjoined Bendinger from disclosing to others any trade secrets arising from his employment with Marshalltown. In light of the action taken by the chancellor, the failure to hold the preliminary injunction proceeding *in camera* was not an abuse of discretion.

For all the foregoing reasons, the appeal is reversed and remanded on direct appeal and affirmed on cross appeal.