

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-17-207

| | |
|---|---|
| DAVID BOX | **Opinion Delivered:** November 8, 2017 |
| APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-16-1752] |
| V. | |
| | HONORABLE BRAD KARREN, JUDGE |
| J.B. HUNT TRANSPORT, INC. APPELLEE | REVERSED AND REMANDED |

## KENNETH S. HIXSON, Judge

Appellant David Box, a former employee of appellee J.B. Hunt Transport (hereinafter "J.B. Hunt"), brings this interlocutory appeal from the trial court's order granting J.B. Hunt's motion for an injunction and temporary restraining order.[1]  In the order, the trial court enjoined Box from disclosing confidential information and trade secrets to Hub Group, Inc. (hereinafter "Hub Group"), and from employment with Hub Group for a period of one year from Box's separation from J.B. Hunt.  The temporary order was based on three agreements containing confidentiality, noncompete, and restricted stock provisions executed between the parties during Box's employment.

Box raises six arguments for reversal of the trial court's order.  Box argues that (1) the trial court erroneously relied on recitals in the agreements; (2) J.B. Hunt failed to prove a

---

[1]The interlocutory order is appealable pursuant to Arkansas Rule of Civil Procedure–Civil 2(a)(6).

likelihood of success of demonstrating that Box breached any agreement; (3) the trial court's order made no findings that any agreement complied with Arkansas law; (4) the trial court erroneously applied Act 921 of 2015 retroactively; (5) the trial court improperly awarded J.B. Hunt attorney's fees and costs; and (6) the trial court made improper and premature rulings in anticipation of a jury trial. We agree that the trial court erred in granting the preliminary injunction and temporary restraining order because J.B. Hunt failed to demonstrate a likelihood of success on the merits and the trial court made insufficient findings and conclusions to support the injunction and restraining order. Therefore, we reverse and remand.

As a threshold matter, we address J.B. Hunt's motion to dismiss Box's appeal, which was filed while the appeal was pending and passed until the case was submitted. In its motion to dismiss, J.B. Hunt asserts that it recently exercised its right in the court below to a voluntary dismissal of its underlying complaint against Box under Arkansas Rule of Civil Procedure 41(a). J.B. Hunt further asserts that the trial court entered an order dismissing its complaint without prejudice. J.B. Hunt argues that because its original claims have been dismissed without prejudice, the provisional remedy based on the claims, i.e., the temporary restraining order and preliminary injunction, have been dissolved. That being so, J.B. Hunt contends that this appeal is moot because any decision rendered would have no practical legal effect on an existing legal controversy.

As a general rule, appellate courts will not review issues that are moot. *Allison v. Lee Cnty. Election Comm'n*, 359 Ark. 388, 198 S.W.3d 113 (2004). Here, however, we cannot agree that the order of dismissal referenced by J.B. Hunt in its motion to dismiss rendered

SLIP OPINION

this appeal moot. At the time the record was filed with our court, there had been no such order of dismissal entered, and it is therefore not part of the record. We will not consider a document not in the record. *Potter v. City of Tontitown*, 371 Ark. 200, 264 S.W.3d 473 (2007). Therefore, J.B. Hunt's argument that the appeal should be dismissed because it dismissed its action pursuant to Arkansas Rule of Civil Procedure 41(a) is not before us.

We observe that, as an alternative reason to dismiss the appeal, J.B. Hunt asserts that the temporary restraining order expires by its terms on October 27, 2017, and that this case was submitted to our court with oral arguments scheduled for October 25, 2017, making a decision prior to expiration of the temporary order practically impossible. However, we do not agree that the expiration of the temporary order moots our review of the order. In the order being appealed, the trial court awarded attorney's fees and costs to J.B. Hunt, which is one of the issues Box raises on appeal. In addition, in the temporary restraining order the trial court ordered J.B. Hunt to post security in an amount sufficient to pay the damages sustained by Box should he be found to have been wrongfully enjoined or restrained. This provision in the trial court's order is expressly authorized by Arkansas Rule of Civil Procedure 65(c). *See also* Ark. Code Ann. § 16-113-405(a)(1) (Repl. 2016). For these reasons, our decision in this case will likely have practical legal effects.

Finally, even were we to agree that a decision rendered on appeal would not affect the rights of the parties to this appeal, we conclude that this appeal would fall under an exception to the mootness doctrine. One of the recognized exceptions to the mootness doctrine involves issues that are capable of repetition but that evade review. *Poland v. Poland*, 2017 Ark. App. 178, 518 S.W.3d 98. Any appeal from a temporary order restraining an

employee from working for a competitor would likely evade review upon expiration of the temporary order before the appeal could be heard by the appellate court.  Furthermore, one of the agreements upon which the trial court based its temporary restraining order and preliminary injunction provides that a violation of the agreement could trigger a two-year remedy and hence, J.B. Hunt could refile its motion and receive another temporary restraining order for another year without review.  Therefore, the trial court's action would evade review and the aggrieved party would not receive the appellate review to which it is entitled.  For these reasons, we deny J.B. Hunt's motion to dismiss and reach the merits of Box's appeal.

The record shows that Box was employed by J.B. Hunt from 2000 until he resigned on October 27, 2016.  From 2004 to 2011, Box was a regional operations manager in the intermodal division.[2]  From 2011 until his separation from employment on October 27, 2016, Box worked as a director of transportation in J.B. Hunt's integrated capacity solutions division in Memphis, Tennessee.  Box's job as a director of transportation was a brokerage position working with customers in a sales capacity.  After leaving his employment with J.B. Hunt, Box accepted a position with another transportation company, Hub Group, as a regional vice president of operations in the Memphis region.  This position was in Hub Group's intermodal division.

On November 22, 2016, J.B. Hunt filed a complaint against Box for breach of contract related to the employment, alleging that by accepting employment with Hub

---

[2]Intermodal is an industry term referring to two or more modes of transportation in conveying goods.

Group, Box had violated several agreements executed during his employment with J.B.

Hunt. The first of these agreements was a Confidentiality Agreement signed by Box in

2004, which provided in pertinent part:

> 3. CONFIDENTIAL INFORMATION. Employee recognizes, acknowledges and agrees that Company operates on a nationwide basis, and that, by reason of Employee's employment with Company, Employee will acquire information concerning Company methods, processes, operations, marketing programs, computer programs, future plans and customers, and other proprietary or otherwise sensitive information. This information ("Confidential Information") is a valuable asset of Company and affects the successful operation of Company's business. If known to Company's suppliers, customers or competitors, such Confidential Information would give such parties a competitive advantage.
>
> 4. TRADE SECRETS. In general, a Company trade secret is information (including a formula, pattern, compilation, program, device, method, technique or process) that derives independent economic value, actual or potential, from being kept secret.
>
> . . . .
>
> Furthermore, Employee recognizes, acknowledges and agrees that some Confidential Information may be trade secret protected by the Arkansas Trade Secrets Act, codified at Ark. Code Ann § 4-75-601, *et seq*.
>
> 5. NON-DISCLOSURE OF CONFIDENTIAL INFORMATION. Employee agrees, as a condition of employment and in consideration for continued employment, as well as other consideration conferred on him/her by Company, that, except as necessary to perform Employee's duties and responsibilities to Company, while employed, Employee will not discuss, disclose, describe, reproduce or use in any manner the Company's Confidential Information.
>
> 6 OBLIGATIONS OF EMPLOYEE AFTER TERMINATION OF EMPLOYMENT. Employee recognizes, acknowledges and agrees that this provision shall survive the termination whether voluntary or involuntary of Employee's employment. Employee agrees that this Confidentiality Agreement precludes him/her from discussing, disclosing, describing, reproducing or using in any manner the Company's trade secrets after Employee's employment with Company has ended for as long as the information is a trade secret. Employee agrees that this Confidentiality Agreement precludes Employee from discussing, disclosing, describing, reproducing or using in any manner the Company's Confidential Information which is not a trade secret for a period of one (1) year following termination.

7.  REMEDIES.  It is further understood that a breach of this Agreement shall entitle Company or Employee, in addition to other legal and equitable remedies available, to apply to any court of competent jurisdiction to enjoin any violation of this Agreement. Employee agrees to the entry of a Temporary Restraining Order or a Preliminary Injunction against Employee precluding violation of this provision pending a resolution of any dispute that may arise regarding this Agreement. Employee recognizes, acknowledges and agrees that if Employee's knowledge and skills are inextricably connected to Company's trade secrets and his/her subsequent employment poses a substantial risk that Company's trade secrets will be discussed, disclosed, described, considered, reproduced or otherwise utilized, such inevitable disclosure will justify an injunction against Employee's competitive employment.

Box also signed a Noncompete and Nonsolicit Agreement in 2013, which provides

in pertinent part:

2.      DEFINITIONS.  As used herein.

. . . .

        b.  "Competing Services" are understood to be services, as an employee, officer, director, owner, consultant or otherwise:  (i) rendered on behalf of a Competing Business that are the same as or substantially similar in purpose or function to the services Employee supervised or provided to the Company in the preceding two years, or (ii) rendered in any position or capacity in which he/she may inevitably disclose, utilize or consider Confidential information gained through his/her employment with Company which would give a Competing Business, customer or other business an unfair competitive advantage.

. . . .

        d.  "Confidential Information" has the same meaning as it does in the Confidential Information and Proprietary Interests Agreement that Employee has also agreed to and that is ancillary to this Agreement—namely, an item of information or a compilation of information, in any form (tangible or intangible), related to Company's business that the Company has not intentionally made public or authorized public disclosure of and that is not readily available to the public through proper means in the same form or compilation, inclusive of but not limited to trade secrets.

. . . .

4.      NONCOMPETE.  During employment with the Company and for a period of one (1) year thereafter, Employee will not, directly or indirectly, provide, supervise, or manage Competing Services in a Prohibited Territory without the advance written consent of the Company in order to help ensure that the Company's trade secrets and other interests are adequately protected.

Finally, Box signed three similar Restricted Stock Agreements in 2013, 2014, and 2015, which provide in pertinent part:

11.  PROTECTIVE COVENANTS

. . . .

(a) Noncompete. During employment with the Company and for a period of two (2) years thereafter, regardless of which party ends the employment relationship or why, Recipient shall not directly or indirectly, for himself or herself or any third party, alone or as a member of a partnership or limited liability company, or as an officer, director, shareholder, financer, member, owner, employee or otherwise, perform, or agree to perform, Conflicting Services for a Competing Business operating in the Restricted Area[.]

. . . .

        "Competing Business" means Expeditors Int'l of Washington, Inc.; Landstar System, Inc.; Ryder System, Inc.; Werner Enterprises, Inc.; CH Robinson Worldwide, Inc.; *Hub Group, Inc.*; ….

        "Conflicting Services" are any services similar in nature, purpose, or function to the services that Recipient provided to the Company in the preceding two year period (or such lesser period as Recipient may have been employed), or the supervision or management of any such services.

. . . .

(d) Specific Performance and Injunction. A violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would not be an adequate remedy at law. Accordingly, if Recipient violates or threatens to violate this Agreement, the Company shall be entitled to an order compelling specific performance, and temporary and permanent injunctive relief in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled.

(Emphasis added.)

In J.B. Hunt's complaint, it generally alleged that Box's employment with Hub Group was the same or substantially similar to his employment with J.B. Hunt, and that performing his responsibilities at Hub Group may result in Box disclosing, or inevitably disclosing, trade secrets or confidential information of J.B. Hunt that would afford Hub Group an unfair competitive advantage. J.B. Hunt requested an order permanently enjoining Box from disclosing any of J.B. Hunt's confidential information and trade secrets, and temporarily enjoining him from employment with Hub Group.

On November 23, 2016, which was one day after it filed its complaint, J.B. Hunt filed a motion for an injunction and temporary restraining order. In that motion, J.B. Hunt alleged that it had demonstrated a likelihood of success on the merits and that it would suffer irreparable harm in the absence of an injunction and restraining order. J.B. Hunt requested that Box be enjoined from disclosing confidential information and trade secrets, and be enjoined from employment with Hub Group.

On February 2, 2017, the trial court held a hearing on J.B. Hunt's motion for an injunction and temporary restraining order. J.B. Hunt presented two witnesses at the hearing, and Box testified on his own behalf.

Brandon Taylor testified that he is a vice president of J.B. Hunt and has been employed there since 2011. Taylor stated that, during Box's last two years of employment with J.B. Hunt, Box was in the integrated capacity solutions division, which involved sales. This division has also been referred to as the brokerage division. Taylor indicated that a portion of that division involved sales to intermodal customers. Taylor repeatedly referred to a J.B. Hunt "playbook," to which Box was privy. However, on further questioning,

Taylor admitted that there is not a tangible "playbook"; rather, the "playbook" was essentially the accumulation of knowledge and experience gained while working at J.B. Hunt that could be transferred elsewhere. Taylor stated that the "playbook" was confidential and indicated that it was constantly changing. Taylor further testified that Hub Group is J.B. Hunt's most significant competitor in the intermodal transportation market.

James Nathan Smith testified that he works for J.B. Hunt and was the senior vice president of intermodal operations between 2010 and 2015. Smith stated that, during Box's employment in the intermodal division between 2004 and 2011, Box gained knowledge of the company's intermodal business model, which was confidential. Smith surmised that Hub Group could benefit from the confidential information Box acquired while working in J.B. Hunt's intermodal division. Smith acknowledged, however, that he had no evidence that Box had disclosed confidential information to any of the drivers at Hub Group and had no reason to believe that Box would discuss this unspecified confidential information with any of those working under him.[3]

At the conclusion of its case, J.B. Hunt stated that it had specific confidential materials that had been disclosed to Box during his employment, which it contemplated introducing into evidence. However, J.B. Hunt elected not to introduce these materials, even under seal. J.B. Hunt's explanation for not introducing the materials was that it anticipated Box

---

[3]We acknowledge that this is a brief synopsis of the testimony of Brandon Taylor and James Nathan Smith. However, because the trial court did not make a finding that Box was performing at Hub Group the same or substantially similar services he had performed at J.B. Hunt, it is unnecessary to recite additional testimony of Taylor and Smith regarding the details of Box's job responsibilities.

would truthfully testify that he did not remember any of it, and it was not going to refresh his memory.

Box testified that, during his work for J.B. Hunt between 2011 and 2016, he was responsible for all aspects of operation and business development within the brokerage division. Box stated that, in his employment with Hub Group, he is the regional vice president over the drayage piece of intermodal operations.[4] Box indicated that at Hub Group he has no interaction with the brokerage division, has no interaction with outside carriers, and is not dealing with customers. Box testified that there were no positions that he managed in his last two years at J.B. Hunt that were substantially similar to the employees or functions he manages at Hub Group. Box further stated that he was not aware of any of J.B. Hunt's trade secrets, and that he had not disclosed in any manner any of J.B. Hunt's confidential information.

On February 14, 2017, the trial court entered an order granting J.B. Hunt's motion for an injunction and a temporary restraining order. In the order, the trial court specifically addressed each of the three pertinent agreements: the 2004 Confidentiality Agreement, the 2013 Noncompete and Nonsolicit Agreement, and the 2015 Restricted Stock Agreement. Each of these agreements contained language that could be relevant in determining whether a temporary restraining order or preliminary injunction could be entered. The trial court made the following findings and conclusions of law:

---

[4]Drayage is an industry term describing the transport of goods over a short distance. Here, it refers to transporting containers from a railyard to a warehouse or similar destination.

Here, this Court finds that Box presumptively and voluntarily agreed to allow JBH injunctive relief when he signed the October 26, 2004, *"Employee Confidentiality Agreement"* which states: "Employee agrees to the entry of a temporary restraining order or a preliminary injunction against Employee... ***if*** *Employee's knowledge and skills are inextricably connected to Company's trade secrets* ***and*** *his subsequent employment poses a substantial risk that Company's trade secrets...disclosure will justify an injunction against Employee's competitive employment."*

Moreover, this Court finds that Box presumptively and voluntarily agreed that a violation of the October 28, 2013; October 28, 2014; and October 21, 2015 *"Restrictive Stock Agreements"* would result in "irreparable harm" in that the above agreements state "a violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would be no adequate remedy at law...the Company shall be entitled to an order compelling specific performance, and temporary and permanent injunctive relief."

Furthermore, this Court finds that the above described "irreparable harm" is immediate in that Hub Group, Inc. and its subsidiary Hub Trucking, Inc. are substantial competitors to JBH. The October 28, 2013; October 28, 2014; and the October 21, 2015, "Restrictive Stock Agreements" all list Hub Group, Inc. as a "competing business." Also, Mr. Brandon Taylor, Vice President of Transportation to JBH, stated Hub Group, Inc., is a "significant competitor" in intermodal sales to JBH. Box also testified that some of Hub Group, Inc., customers are also JBH customers, and Box would be in violation of the non-compete agreement if Box had contact with certain JBH customers in Memphis, Tennessee.

Also, this Court finds that Box presumptively and voluntarily agreed that Box's position as Operations Manager and Director of Transportation while an employee at JBH provided him with access to JBH's confidential information. Box signed the October 26, 2004, *"Employee Confidentiality Agreement"* which states in part that "Employee...acknowledges and agrees that...Employee will acquire information concerning Company methods, processes, operations, marketing programs, computer programs, future plans, and customers and other proprietary or otherwise sensitive information. This information...is a valuable asset of Company and affects the successful operation of Company's business. If known to Company's...competitors such confidential information would give such parties a competitive advantage." Therefore, for the above-stated reasons this Court finds that there is no adequate remedy at law and that in the absence of an injunction or restraining order against Hub Group, Inc., and/or Hub Trucking, Inc., will result in irreparable and immediate harm to JBH by providing an unfair competitive advantage to Hub Group, Inc., and/or Hub Trucking, Inc.

Additionally, this Court finds that JBH has demonstrated a likelihood of success on its merits that Box is in breach of his *covenant not to compete* with JBH. That, although this Court has not made a determination whether JBH has a "protectable business interest" pursuant to Ark. Code Ann. § 14-75-101(b), this Court does find that JBH has presented sufficient evidence that demonstrates a likelihood of success that Box breached his covenant not to compete with JBH. Here, Box presumptively and voluntarily agreed that JBH has a "protectable business interest" when Box signed the October 26, 2004, "Employee Confidentiality Agreement" wherein Box acknowledged that information about JBH's "method of operation, distribution and customers" was of a "proprietary nature" and that JBH's "margins of profitability, strategic planning for the future and JBH's "online reporting database" were "trade secrets." Moreover, Box promoted himself in his resume that his job experience with JBH included that he was responsible for full profit and loss strategy; budgeting and forecasting, client relationship management, while Box also recognized and acknowledged this as "confidential information" in the October 26, 2004 "Employee Confidentiality Agreement."

(Emphasis added.) Based on these conclusion and findings, the trial court enjoined Box from disclosing confidential information and trade secrets and from employment with Hub Group through October 27, 2017.

In this appeal, Box raises several arguments challenging the issuance of the injunction and temporary restraining order. As part of his argument, Box contends that the trial court erroneously relied on the recitals in the agreements, rather than any evidence presented by J.B. Hunt, and further that J.B. Hunt did not demonstrate a likelihood of success of proving Box breached any agreement. To address these arguments, we must examine the standards for issuing a preliminary injunction as well as the relevant law pertaining to noncompete agreements.

The supreme court set forth the standard of review for preliminary injunctions in *Baptist Health v. Murphy*, 365 Ark. 115, 225 S.W.3d 800 (2006):

In determining whether to issue a preliminary injunction pursuant to Rule 65, the trial court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving

party has demonstrated a likelihood of success on the merits. This court reviews the grant of a preliminary injunction under an abuse-of-discretion standard. The standard of review is the same for the two essential components of a preliminary injunction: irreparable harm, and likelihood of success on the merits. There may be factual findings by a circuit court that lead to conclusions of irreparable harm and likelihood of success on the merits, and those findings shall not be set aside unless clearly erroneous. But a conclusion that irreparable harm will result or that the party requesting the injunction is likely to succeed on the merits is subject to review under an abuse-of-discretion standard.

When an appeal reaches a court via an order granting a preliminary injunction, the appellate court will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction. The sole question before the appellate court is whether the circuit court "departed from the rules and principles of equity in making the order," and not whether the appellate court would have made the order.

365 Ark. at 121−22, 225 S.W.3d at 806−07 (internal citations omitted).

The law pertaining to noncompete agreements is now codified at Arkansas Code Annotated section 4-75-101 (Supp. 2015), which became effective on July 22, 2015, pursuant to the enactment of Act 921 of 2015. However, in the present case the statutory law arguably applies only to the parties' third restricted stock agreement executed in October 2015 after Act 921 became effective. The remaining four agreements[5] predated the Act and are subject to common law rules.

Arkansas Code Annotated section 4-75-101(a) provides:

(a) A covenant not to compete agreement is enforceable if the agreement is ancillary to an employment relationship or part of an otherwise enforceable employment agreement or contract to the extent that:
(1) *The employer has a protectable business interest*; and
(2) The covenant not to compete agreement is limited with respect to time and scope in a manner that is not greater than necessary to defend the protectable business interest of the employer.

_____

[5]The 2004 Confidentiality Agreement, the 2013 Noncompete and Nonsolicit Agreement, and the 2013 and 2014 Restricted Stock Agreements.

(Emphasis added.) Subsection (b) of the above statute provides that the protectable business interest of the employer includes the employer's trade secrets and confidential business information that is confidential, proprietary, and increases in value from not being known by a competitor. Here, however, the trial court expressly stated in its order that "this Court has not made a determination whether JB Hunt has a 'protectable business interest' pursuant to Arkansas Code Annotated § 4–75–101(b)[.]" Therefore, we need not address whether this statute is applicable to any of the agreements herein.

Under common-law standards, we have held that in order for a noncompete agreement to be valid, the following three requirements must be met: (1) the covenantee must have a valid interest to protect; (2) the geographical restriction must not be overly broad; and (3) a reasonable time limit must be imposed. *Burleigh v. Ctr. Point Contractors, Inc.*, 2015 Ark. App. 615, 474 S.W.3d 887. The test for reasonableness of contracts in restraint of trade is that the restraint imposed upon one party must not be greater than is reasonably necessary for the protection of the other and not so great as to injure a public interest. *Id.* Where a noncompete agreement grows out of an employment relationship, appellate courts have found an interest sufficient to warrant enforcement of the agreement only in those cases where the employer provided special training or made available trade secrets, confidential business information, or customer lists, and then only if it is found that the employee was able to use the information so obtained to gain an unfair competitive advantage. *Id.* However, it has also been held that an employee's experience, knowledge, and skills cannot be erased from one's mind: "Our society is extremely mobile and our free economy is based upon competition; one who has worked in a particular field cannot be

compelled to erase from his mind all of the general skills, knowledge, and expertise acquired through his experience. Restraints cannot be lightly placed upon an employee's right to compete in the area of his greatest worth." *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 423, 994 S.W.2d 468, 475 (1999). In *Burleigh*, *supra*, we stated that covenants not to compete are not looked upon with favor by the law.

In order to determine whether the trial court abused its discretion in finding that J.B. Hunt demonstrated a likelihood of success on the merits, we must examine each of the three relevant agreements as applied to the facts presented because each of the agreements contain differing language that may trigger a violation. We must also analyze the findings and conclusions made by the trial court in support of its decision to enter the injunction and temporary restraining order.

### I. *The 2013 Noncompete and Nonsolicit Agreement*

We begin with the parties' noncompete and nonsolicit agreement executed in 2013, which prohibited Box from providing competing services for a period of one year after his separation from J.B. Hunt. Under that agreement, "competing services" are understood to be services, as an employee "(i) rendered on behalf of a competing business that are the same or substantially similar in purpose or function to the services the employee supervised or provided to the company *in the preceding two years*; or (ii) rendered in any position or capacity in which he may inevitably disclose, utilize or consider *confidential information* gained through his employment with company which would give the competing business . . . an unfair competitive advantage." Hence, Box could have violated the 2013 noncompete agreement on two independent grounds. Box could have rendered services to Hub Group that were

the same or similar to those services provided to J.B. Hunt in the preceding two years; or Box could have disclosed, utilized, or considered J.B. Hunt's confidential information while working for Hub Group that would have given Hub Group an unfair competitive advantage.

Although the trial court concluded that J.B. Hunt had demonstrated a likelihood of success that Box had breached this noncompete agreement, the trial court made no comment on whether Box was performing "the same or substantially similar services" for Hub Group that he had been providing to J.B. Hunt for the preceding two years, which would be essential for a violation of the first ground of the "competing services" definition. Therefore, we need not discuss whether Box was performing the same or substantially similar services, and the first ground fails as justification for the injunction. So, we turn to the second ground. Under the second ground of the definition, Box could have been performing violative competing services at Hub Group *if* he had actually used confidential information that resulted in an unfair advantage to Hub Group, or *if* the confidential information Box possessed was of such character that Box would inevitably use the information, giving Hub Group an unfair competitive advantage. The noncompete and nonsolicit agreement defines "confidential information" as "an item of information or a compilation of information, in any form (tangible or intangible), related to company's business that the company has not intentionally made public or authorized public disclosure of and that is not readily available to the public through proper means in the same form or compilation, inclusive of but not limited to trade secrets." In the trial court's order, it is clear that the court did not find or conclude there was a likelihood that Box had actually

used confidential information to benefit Hub Group. Similarly, the trial court did not specifically conclude that the confidential information possessed by Box was of such character that Box would "inevitably use" the information. Since, however, the court concluded there was a violation, we are left to infer that the court concluded that the confidential information possessed by Box was of such character that Box may inevitably disclose the information to Hub Group, giving Hub Group a competitive advantage.

We conclude that the trial court erred in finding that J.B. Hunt established a likelihood of success that Box had violated the 2013 noncompete and nonsolicit agreement. A party seeking a preliminary injunction bears the burden to prove a reasonable probability of success on the merits. *Muntaqim v. Hobbs*, 2017 Ark. 97, 514 S.W.3d 464. Our supreme court has further stated that the court requires proof of facts establishing that a party is entitled to injunctive relief. *See Wilson v. Pulaski Ass'n of Classroom Teachers*, 330 Ark. 298, 954 S.W.2d 221 (1997). In this case, there was testimony indicating that any information obtained by Box while working for J.B. Hunt in the intermodal division between 2004 and 2011 would be dated and less useful due to changed conditions. Moreover, J.B. Hunt produced no evidence of any specific confidential information that Box had obtained during his employment. And there was an absence of any evidence that any confidential information would be inevitably disclosed by Box or would give Hub Group an unfair advantage. J.B. Hunt's witnesses merely testified in conclusory fashion that unspecified information obtained by Box during his employment with J.B. Hunt could be used in his employment with Hub Group; this was not sufficient to demonstrate a reasonable probability that Box violated the agreement. *See, e.g.*, *Echezona v. City of New York*, 125

17

F.3d 843 (2d Cir. 1997) (holding that, in seeking a preliminary injunction, conclusory allegations are insufficient to establish a likelihood of success on the merits). As such, we conclude that the preliminary injunction cannot be upheld based on the provisions of the 2013 noncompete and nonsolicit agreement as applied to the facts.

## II. *Restricted Stock Agreements*

We next examine the restricted stock agreement executed by the parties in 2013, 2014, and 2015. Box vested in 40 stock options each year. The restricted stock agreement provides:

> 11.     Protective Covenants
>
> . . . .
>
> a.      Noncompete: During employment with the Company and for a period of two years thereafter regardless of which party ends the employment relationship or why Recipient shall not directly or indirectly…perform, or agree to perform, Conflicting Services for a Competing Business operating in the Restricted Area[.]
>
> . . . .
>
> "Conflicting Services" are any services *similar in nature, purpose or function to the services that Recipient provided to the Company in the preceding two year period*…or the supervision or management of any such services.

(Emphasis added.) Because Box agreed not to provide to a competing business services similar in nature, purpose, or function to the services he provided to J.B. Hunt during the preceding two-year period, the issue here is whether the services he performed at Hub Group met that criteria. However, in the trial court's order, it does not discuss whether Box performed services at Hub Group that were similar in nature, purpose, or function to those he had performed for J.B. Hunt over the preceding two years. Instead, relying on a separate provision of the restricted stock agreement, the trial court found:



[T]his Court finds that Box presumptively and voluntarily agreed that a violation of the…"Restrictive Stock Agreements" would result in "irreparable harm" in that the above agreements state "a violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would be no adequate remedy at law…the Company shall be entitled to an order compelling specific performance, and temporary and permanent injunctive relief."

It is clear to this court that the trial court did not find the necessary facts to trigger the noncompete clause in the restricted stock agreement. The trial court here and in other parts of its order used the phrase "presumptively and voluntarily" to essentially find that, because Box voluntarily signed the agreements, J.B. Hunt is presumptively entitled to injunctive relief regardless of the facts. However, by signing the restricted stock agreement, Box did not agree that J.B. Hunt would automatically be entitled to injunctive relief; *he agreed that it would be entitled to injunctive relief only if Box committed a violation of the agreement.* This necessarily involves an inquiry into whether Box likely violated the agreement based on the evidence presented. Because the trial court made no findings on that issue, we conclude that it erroneously awarded injunctive relief based on the restricted stock agreement.

### III. *2004 Employee Confidentiality Agreement*

Finally, we address the trial court's reliance on the 2004 employee confidentiality agreement. That agreement provides:

6. OBLIGATIONS OF EMPLOYEE AFTER TERMINATION OF EMPLOYMENT. Employee recognizes, acknowledges and agrees that this provision shall survive the termination whether voluntary or involuntary of Employee's employment. Employee agrees that this Confidentiality Agreement precludes him/her from discussing, disclosing, describing, reproducing or using in any manner the Company's trade secrets after Employee's employment with Company has ended for as long as the information is a trade secret. Employee agrees that this Confidentiality Agreement precludes Employee from discussing, disclosing,



describing, reproducing or using in any manner the Company's Confidential Information which is not a trade secret for a period of one (1) year following termination.

7. REMEDIES. If is further understood that a breach of this Agreement shall entitle Company or Employee, in addition to other legal and equitable remedies available, to apply to any court of competent jurisdiction to enjoin any violation of this Agreement. Employee agrees to the entry of a Temporary Restraining Order or a Preliminary Injunction against Employee precluding violation of this provision pending a resolution of any dispute that may arise regarding this Agreement. Employee recognizes, acknowledges and agrees that if Employee's knowledge and skills are inextricably connected to Company's trade secrets and his/her subsequent employment poses a substantial risk that Company's trade secrets will be discussed disclosed, described, considered, reproduced or otherwise utilized, such inevitable disclosure will justify an injunction against Employee's competitive employment.

Under paragraph six above, there are two independent sources of protected material, i.e., confidential information and trade secrets. A violation of either source triggers different relief. If information possessed by Box is a *trade secret*, Box is precluded from discussing, disclosing, considering, reproducing, or otherwise utilizing the information as long as it remains a *trade secret*. If information possessed by Box is not a trade secret but is other *confidential information*, paragraph six provides that Box may not disclose the confidential information for a period of one year. Paragraph seven of the agreement describes the differing remedies for trade-secret violations and confidential-information violations. Paragraph seven provides that if Box's knowledge and skills are inextricably connected to the company's *trade secrets*, and his subsequent employment poses a substantial risk that the company's *trade secrets* will be disclosed, *such inevitable disclosure will justify an injunction against Box's competitive employment.* However, paragraph seven does not provide injunctive relief against Box's employment with Hub Group for a violation of the *confidential information.* Therefore, the threshold inquiry into whether Box violated the 2004 Confidentiality

Agreement to the extent necessary to justify being enjoined from employment by Hub

Group is to determine whether Box possessed confidential information or trade secrets.

The trial court made the following findings and conclusions with respect to the

employee confidentiality agreement:

> Here, this Court finds that Box presumptively and voluntarily agreed to allow JBH injunctive relief when he signed the October 26, 2004, "Employee Confidentiality Agreement" which states: "Employee agrees to the entry of a temporary restraining order or a preliminary injunction against Employee...*if* Employee's knowledge and skills are inextricably connected to Company's *trade secrets* **and** his subsequent employment poses a substantial risk that Company's *trade secrets*...disclosure will justify an injunction against Employee's competitive employment."

> . . . .

> Also, this Court finds that Box presumptively and voluntarily agreed that Box's position as Operations Manager and Director of Transportation while an employee at JBH provided him with access to JBH's *confidential information*. Box signed the October 26, 2004, "Employee Confidentiality Agreement" which states in part that "Employee...acknowledges and agrees that... Employee will acquire information concerning Company methods, processes, operations, marketing programs, computer programs, future plans, and customers and other proprietary or otherwise sensitive information. This information...is a valuable asset of Company and affects the successful operation of Company's business. If known to Company's...competitors such *confidential information* would give such parties a competitive advantage."

(Emphasis added.)

It is clear that the trial court did not mention *trade secrets* in its findings and conclusions

to explain Box's violation of the 2004 Confidentiality Agreement. In fact, the language

used by the trial court, "information concerning Company methods, processes, operations,

marketing programs," comes directly from the agreement's definition of "Confidential

Information." Pursuant to paragraph seven of the employee confidentiality agreement, J.B.

Hunt could only enjoin Box's competitive employment with Hub Group if Box possessed

*trade secrets* and his subsequent employment posed a substantial risk that the *trade secrets* would be disclosed. Paragraph seven does not prohibit Box from competitive employment with Hub Group for possessing confidential information. Here, there was no finding or conclusion by the trial court that Box possessed or likely possessed *trade secrets* that would justify an injunction against competitive employment.

Furthermore, there was an absence of evidence to support the injunction as it related to confidential information under the provisions of the confidentiality agreement. Paragraph six provides that the employee is precluded from disclosing in any manner the company's confidential information which is not a trade secret for one year following termination, and paragraph seven provides that a *breach* of the agreement shall entitle the company to apply to enjoin any *violation* of the agreement. The trial court's order makes no specific finding that Box had violated the agreement by disclosing confidential information to Hub Group, nor would the testimony support such a finding. In this case J.B. Hunt's witnesses could not say whether Box had disclosed confidential information, and Box testified that he had not disclosed in any manner any of J.B. Hunt's confidential information. Therefore, the trial court's conclusion that J.B. Hunt would likely succeed on the merits pursuant to the confidentiality agreement was erroneous.

Based on the foregoing, we hold that the trial court abused its discretion in granting J.B. Hunt's motion for an injunction and temporary restraining order because J.B. Hunt failed to demonstrate a likelihood of success on the merits, and the trial court made

insufficient findings and conclusions to support its order. Because we reverse the order based on these grounds, we need not address the remaining points raised by Box on appeal.[6]

Reversed and remanded.

GRUBER, C.J., and MURPHY, J., agree.

*Friday, Eldredge & Clark, LLP*, by: *Elizabeth Robben Murphy*, *H. Wayne Young*, and *Marshall Ney*, for appellant.

*Cullen & Co., PLLC*, by: *Tim J. Cullen*, for appellee.

---

[6]We observe that, under Box's last point on appeal, he contends that the trial court made improper and premature rulings in anticipation of a jury trial. The trial court's order granting the injunction provided that all evidence admitted at the temporary hearing is admissible at trial, and that the evidence shall become part of the trial record and need not be repeated at trial. Although we reverse the order granting the injunction, we note that this aspect of the order was consistent with the provisions contained in Arkansas Rule of Civil Procedure 65(a)(2). Therefore, the evidence received at the temporary hearing should be part of the record if there is a jury trial held on Box's complaint following our remand. Box has also challenged the trial court's award of attorney's fees, and because we are reversing the interlocutory order on appeal, the award of attorney's fees was premature and is reversed as well.