# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-1474
_____

Progressive Technologies, Inc.

*Plaintiff - Appellee*

v.

Chaffin Holdings, Inc.; David Chaffin

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: January 14, 2021
Filed: May 2, 2022
_____

Before LOKEN, GRASZ, and KOBES, Circuit Judges.
_____

GRASZ, Circuit Judge.

Progressive Technologies, Inc. sued David Chaffin and Chaffin Holdings, Inc. for breaching a noncompete agreement, tortious interference with business expectancy, and civil conspiracy. Chaffin and Chaffin Holdings appeal the district court's preliminary injunction entered against them. We reverse.

# I. Background

Chaffin owned Arkansas State Security, Inc., which sold and maintained video security equipment for school districts. Progressive is a low-voltage cabling and systems contractor. In 2013, Progressive bought Arkansas State Security[1] from Chaffin. Three relevant contracts governed this transaction.

The first was the asset purchase agreement in which Progressive agreed to pay $1.9 million over three years to purchase Arkansas State Security's assets, including its customer lists and goodwill. The second was an employment agreement in which Progressive agreed to employ Chaffin for a one-year term, followed by indefinite at-will employment. The employment agreement stated Chaffin was to assist with new sales and transition customer and vendor relationships for Progressive.

The third contract was the noncompete agreement, which included four restrictive covenants. The first covenant (the competition restriction) barred Chaffin from being involved in the "Video Security Business" throughout the state of Arkansas for five years. The second covenant (the customer-solicitation restriction) barred Chaffin from soliciting any of Progressive's current or prospective customers for video security sales or for the purpose of terminating their business with Progressive for five years. The third covenant (the employee-solicitation restriction) barred Chaffin from soliciting any Progressive employees for two years. Each of the time limitations in the first three covenants was designated to begin on the latter of the noncompete agreement's signing date or the termination of Chaffin's employment. The fourth covenant (the nondisclosure clause) barred Chaffin indefinitely from disclosing any proprietary information.

After the initial one-year transition term, Chaffin continued working for Progressive for an additional five and a half years until Progressive terminated him.

---

[1]The companies changed names during this period as part of the transaction, but for purposes of our analysis we need not address the changes.

After his termination, Chaffin allegedly met with four Progressive school district customers to obtain their business to benefit himself, Chaffin Holdings, and another company, AJL Technology, Inc., which is a competitor of Progressive. Each of the four school districts withdrew their business from Progressive, and one began contracting with AJL. Chaffin also allegedly had others steal documents from Progressive and allegedly solicited many Progressive employees to come work for AJL.

Progressive sued Chaffin, Chaffin Holdings, and others (not relevant here) in federal court. Progressive claimed Chaffin breached the restrictive covenants in the noncompete agreement and misappropriated trade secrets in violation of the Arkansas Trade Secrets Act. *See* Ark. Code Ann. § 4-75-601. Progressive also claimed both Chaffin and Chaffin Holdings tortiously interfered with Progressive's business expectancy and committed civil conspiracy. Each of these claims arose under Arkansas law.

Progressive moved for a preliminary injunction against Chaffin and Chaffin Holdings based on all its claims except the tortious interference claim. The district court granted Progressive's motion, concluding Progressive was likely to succeed on its claims for breach of contract, civil conspiracy, and—though not raised in Progressive's motion—tortious interference. The district court also concluded each of the other preliminary injunction factors weighed in Progressive's favor. The district court preliminarily enjoined Chaffin and Chaffin Holdings from, among other things, violating the noncompete agreement.

Chaffin and Chaffin Holdings appeal. Progressive no longer seeks injunctive relief for its misappropriation claim but asserts the district court properly granted the preliminary injunction on the other claims.

## II. Analysis

Our review of the grant "of a preliminary injunction is layered: fact findings are reviewed for clear error, legal conclusions are reviewed de novo, and the ultimate decision to grant the injunction is reviewed for abuse of discretion." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (cleaned up) (quoting *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 754 (8th Cir. 2018)). Because we are sitting in diversity, we apply state substantive law and federal procedural law. *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1016 (8th Cir. 2021).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must show the preliminary injunction is warranted. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). The district court must consider: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Miller*, 9 F.4th at 1014 (quoting *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Generally, no single factor is dispositive. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). The movant's failure to show irreparable harm, however, is a sufficient ground to deny a preliminary injunction. *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021).

Two more principles guide our analysis. First, to satisfy the likelihood of success factor, the movant need not "prove a greater than fifty [percent] likelihood that [it] will prevail on the merits." *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (second alteration in original) (quoting *Dataphase*, 640 F.2d at 113). Instead, the "movant must show that it has at least a 'fair chance of prevailing.'" *Miller*, 9 F.4th at 1014 (quoting *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013)). If a movant does not satisfy the likelihood of success

prong, it "strongly suggests that preliminary injunctive relief should be denied." *D.M.*, 917 F.3d at 999 (quoting *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)). Second, a movant suffers irreparable harm when it "has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2019)).

Here, Progressive fails to show it is entitled to this preliminary injunction. We address each relevant claim in turn.

### A. Breach of the Noncompete Agreement

Progressive does not establish a fair chance of prevailing on its breach of the noncompete agreement claim. Arkansas is generally skeptical of noncompete agreements and considers them on a case-specific basis. *Stuart C. Irby Co. v. Tipton*, 796 F.3d 918, 924–25 (8th Cir. 2015). To be enforceable, noncompete agreements generally "must meet three requirements: [1] there must be a valid interest to protect; [2] the time limit contained in the agreement must be reasonable; and [3] the scope of the agreement must not be overly broad." *Optical Partners, Inc. v. Dang*, 381 S.W.3d 46, 53 (Ark. 2011). The noncompete agreement must be "no greater than what is reasonably necessary to secure the interest of the party protected by the contract and [] not so broad as to be injurious to the public interest." *Id.* Arkansas applies "stricter scrutiny" to noncompete agreements "in *employment* contracts . . . than those connected with a *sale of a business*." *Dawson v. Temps Plus, Inc.*, 987 S.W.2d 722, 726 (Ark. 1999).

Although it is a close call, we conclude Chaffin's noncompete agreement is properly characterized and analyzed as one in an employment contract. This is because under the terms of the agreement it was Progressive's termination of Chaffin's *employment*—six and a half years after the business sale and more than three years after Progressive's payment plan for the business ended—that triggered

the noncompete agreement's obligations. By Progressive's own admissions, Chaffin's noncompete agreement consisted of "post-employment" and "post-termination" restrictions. Given the distant temporal proximity between the business sale and Chaffin's noncompete obligations, we apply the "stricter scrutiny" associated with noncompete agreements in employment contracts. *See Dawson*, 987 S.W.2d at 726.[2]

The noncompete agreement's competition and customer-solicitation restrictions both likely fail this stricter scrutiny. The competition restriction's five-year length is likely too long, and the restriction unreasonably defines the protected business activity as any business Progressive "conducted during *any period*" between the noncompete agreement's signing date and Chaffin's termination—which could ban Chaffin from engaging in business activities Progressive abandoned years before his termination. *Noncompete Agreement*, Appellant's Addendum at 12 ¶ 3(A) (emphasis added); *see Bailey v. King*, 398 S.W.2d 906, 908 (Ark. 1966) ("It seems clear that this court is of the view that five years is an unreasonable length of time to restrict a former employee's competition.").

The customer-solicitation restriction also goes well beyond what is required to protect Progressive's valid interests. While Progressive had a valid interest in protecting customers Chaffin helped establish and with whom Chaffin closely worked, the customer-solicitation restriction here unreasonably goes beyond this valid interest by prohibiting Chaffin from contacting prospective customers with

---

[2]The dissent asserts it is unclear whether this "stricter scrutiny" applies because Arkansas lacks binding precedent about hybrid noncompete agreements entered into during a business sale but triggered upon one's termination of employment. This lack of precedent, however, does not relieve us from our role in this case. "When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the same issue before us." *N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 892 (8th Cir. 2020) (quoting *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010)). Here, we predict the Arkansas Supreme Court would reach the same result given these facts for the reasons articulated.

-6-

whom he had no contact. *See Morgan v. W. Memphis Steel & Pipe, Inc.*, 22 F. Supp. 3d 929, 932 (E.D. Ark. 2014) ("[T]he noncompete clauses take it a step too far by attempting to protect 'prospective future customers or clients.'"). This restriction protects Progressive from "ordinary competition"—which Arkansas law does not allow. *See Bendinger v. Marshalltown Trowell Co.*, 994 S.W.2d 468, 472 (Ark. 1999).[3] Because the competition and customer-solicitation restrictions are invalid as written, they are unenforceable. *See NanoMech, Inc. v. Suresh*, 777 F.3d 1020, 1025 (8th Cir. 2015) (applying Arkansas law).[4]

Progressive's failure to show a fair chance of prevailing strongly suggests denying injunctive relief. *See D.M.*, 917 F.3d at 999. And the balance of the other preliminary injunction factors does not overcome this strong suggestion. On the one hand, Progressive may lose more business. On the other, an injunction may strictly limit Chaffin's employability for what may be the remainder of his working years. All the while, an injunction constrains Arkansas schools' choices in who they do business with. We thus conclude the district court abused its discretion by granting this preliminary injunctive relief for this claim.

---

[3]We need not address issues related to the noncompete agreement's nondisclosure or employee-solicitation restrictions, the latter of which bar Chaffin from "in any manner influenc[ing]" any Progressive employees *or* independent contractors from leaving their service. Even if we assumed Progressive would likely succeed in showing Chaffin breached the nondisclosure clause and/or the employee-solicitation restrictions, it does not support the broad preliminary injunction entered here. *See St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022–23 (8th Cir. 2015) (stating "a preliminary injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law") (cleaned up) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).

[4]Arkansas law now allows courts to reform noncompete agreements so their terms are reasonable and enforceable. *See* Ark. Code Ann. § 4-75-101(f) (2015). But because the noncompete agreement here predates this statute, it remains subject to the common law and cannot be rewritten by the court. *See Box v. J.B. Hunt Transp., Inc.*, 533 S.W.3d 603, 613 (Ark. Ct. App. 2017).

## B. Tortious Interference and Civil Conspiracy

Likewise, Progressive's tortious interference claim cannot support the injunction. We need not address the likelihood of success for this claim. For even if Progressive has a fair chance of prevailing on this claim, Progressive fails to show any irreparable harm resulting from it. Progressive alleges it suffered lost contractual relationships and business expectancies with four school districts, but it does not show its harm is irreparable here.[5] The dissent concludes there is irreparable harm only after combining the damages from the tortious interference claim with the damages from the noncompete agreement violation claim. But mixing these claims is improper because Progressive is unlikely to succeed on the noncompete agreement violation claim. And juries are routinely asked to calculate damages arising from ordinary breaches of contract, which are the damages Progressive alleges arose from the tortious interference claim. Progressive's failure to show irreparable harm on this tortious interference claim bars preliminary injunctive relief.[6] *See Sessler*, 990 F.3d at 1156.

Finally, we conclude the district court also abused its discretion by issuing this preliminary injunction based on Progressive's civil conspiracy claim. In Arkansas, civil conspiracy "is not a separate tort and must be based on the underlying tort[i]ous activity." *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004). Chaffin's or Chaffin Holdings' underlying tortious activity, if any, does not support this preliminary injunction because Progressive does not show that any harm

---

[5]Progressive seemed to understand its harm was reparable when it filed its complaint. Under the tortious interference count, Progressive alleged it was "entitled to recover its damages from Defendants in an amount to be proven at trial." It did not allege, as it did under its breach of noncompete agreement count, that the harm was irreparable and that damages were inadequate.

[6]Even if the harm resulting from Chaffin's alleged tortious interference was irreparable, the preliminary injunction here is not narrowly tailored to address the harms arising from the tortious interference.

-8-

resulting from the underlying tortious activity is irreparable. Progressive is thus not entitled to injunctive relief on the civil conspiracy claim.

### III. Conclusion

For the reasons stated herein, we reverse the district court's grant of the preliminary injunction.

LOKEN, Circuit Judge, dissenting.

Progressive Technologies filed a Verified Complaint commencing this unfair competition lawsuit on February 7, 2020, immediately moving for a temporary restraining order and preliminary injunction. After a two-day evidentiary hearing at which Progressive called three witnesses and introduced eleven fact declarations, the district court enjoined Progressive's former employee, David Chaffin, from contacting or soliciting Progressive's customers, competing with Arkansas school district customers within 150 miles of Little Rock, and violating Chaffin's non-compete agreement with Progressive. Chaffin appeals this interlocutory order. See 28 U.S.C. § 1292(a)(1).

"A district court has broad discretion when ruling on requests for preliminary injunctions, and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." Safety-Kleen Sys., Inc. v. Hennkens, 301 F.3d 931, 935 (8th Cir. 2002) (citation omitted). "The abuse-of-discretion standard means the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (quotation omitted). Of course, the easiest -- and most improper -- way to find an abuse of discretion is to ignore the facts on which the district court based preliminary injunctive relief. That is what the court does here. Fixated on the non-compete covenants, which it concludes are unenforceable under Arkansas law, the court reverses a preliminary injunction protecting Progressive from a textbook case of unfair competition by a former employee seeking to destroy his former employer by

stealing its employees, its proprietary information, and its customers. I respectfully dissent.

1. To put the appeal in proper perspective under Arkansas law, I need to recount many of the facts the court ignores. In early 2013, Progressive purchased the tangible and intangible assets of Chaffin's business for $1.9 million. The transaction was reflected in an asset sale agreement and in separate non-competition and employment agreements. Most of the purchase price, $1.78 million, was for goodwill, particularly Chaffin's customer relationships in the Arkansas school district community. Progressive's President, Chris Brubaker, testified at the preliminary injunction hearing that Progressive would not have purchased Chaffin's business without non-compete covenants because the "value of the business was our ability to take over his . . . relationships without interference."

The asset purchase agreement provided that Progressive would employ Chaffin for $20,000 the first year, pay a commission of 10% of his gross sales thereafter, and employ his wife for $80,000 for one year. The employment agreement provided for an initial one-year term followed by an at-will employment relationship. In the non-competition covenants, Chaffin promised that, following termination, he would not (i) compete in the "Video Security Business" in Arkansas for five years; (ii) solicit Progressive's customers or prospective customers to purchase video security services or terminate relationships with Progressive for five years; (iii) solicit Progressive's employees to leave Progressive for any reason for two years; and (iv) disclose proprietary information except in the course of and during his employment, and would return proprietary information upon termination "for any reason."

Between March 2013 and November 2019, employee Chaffin earned $1.5 million in commissions. In March 2014, at Chaffin's request "for tax purposes," Progressive began paying commissions to Chaffin Holdings Inc. The district court found that "nothing about the working arrangement or relationship between Progressive and Chaffin changed" except the name on the commission checks.

-10-

In mid to late 2019, Chaffin accused Progressive of failing to pay fees owed to TIPS.[7] His relationship with Progressive deteriorated. At a meeting on November 13, 2019, Brubaker told Chaffin it was time to "put a period on the entire sales transaction" and asked if Chaffin would retire. Chaffin replied, "you'll have to fire me," which Progressive did in a November 16 termination letter stating that Progressive would hold Chaffin to his restrictive covenant commitments and demanding he cease contacting Progressive employees and customers.

Joey Howard, a defendant who settled with Progressive after the first day of the preliminary injunction hearing, testified he left Progressive in 2018 to work for Broadband Development Group, a Progressive competitor owned by Alise Smith and Lou McAlister. On January 15, 2020, Howard helped Smith and McAlister create settling defendant AJL Technology, Inc. ("AJL"), with Howard as Chief Operating Officer, to compete with Progressive for contracts with Arkansas school districts, customers that accounted for seventy percent of Progressive's Arkansas business.

In Declarations admitted into evidence at the preliminary injunction hearing, Progressive Service Technician Terry Yarberry averred that Chaffin and Howard called him in mid-November 2019, urging him to leave Progressive. Chaffin said, you "need to be ready to make a move." Howard said "they were going to take the school systems away from Progressive." Progressive Operations Manager Paul Stinson averred that Chaffin called him in mid-November and said that Stinson "should leave because Progressive," and that Progressive "was about to lose several large school district maintenance customers" and "was probably not going to make it." Project Manager Chris Glasgow, Service Technician Yarberry, Security Alarm Technician Caleb Chaffin, and Lead Technician Lynn Chaffin averred that Howard urged each of them in January to leave Progressive and join AJL. Howard told Caleb Chaffin that David Chaffin was "working with us." Technician Reuben Southerland

[7]TIPS, a Texas purchasing cooperative, allows school district members to award contracts to approved vendors such as Progressive without adhering to normal bid procedures. The vendor remits one to two percent of the contract price to TIPS.

averred that in early February, settling defendant Brandon Clements said he was now working with Howard and David Chaffin and they were going to take the Malvern and Greenbrier school districts from Progressive.

Howard testified, and school district records confirmed, that beginning January 10, 2020, Howard and Chaffin met with the superintendents of the Malvern, De Queen, and Mount Vernon school districts. Chaffin advised the superintendents that TIPS was auditing Progressive and reintroduced Howard as someone who could do the work being performed by Progressive. As a result of these efforts:

-- On January 14, Brandon Clements (then a Progressive employee) emailed Brubaker that the Malvern superintendent "has to cancel our contract on the High School project [because he] signed a contract with David Chaffin. . . . Now that David is gone, I am going to look into other companies." Malvern rescinded contracts it awarded Progressive in 2018 to provide equipment and service; it contracted with AJL to perform that work.

-- De Queen School District rescinded contracts with Progressive two days before meeting with Howard and Chaffin, who "were interested in bidding on our high school technology needs."

-- Chaffin met with the superintendent of Lakeside School District on January 10 to introduce Howard "and his business." On January 21, Progressive was invited to rebid on a Lakeside project after being previously advised it was the low bidder.

-- Chaffin visited El Dorado school superintendent Jim Tucker on January 14, the day Tucker emailed Progressive's Clements not to begin work on three contracts Progressive had been awarded. A Declaration by Tucker averred that the District cancelled jobs with Progressive because Tucker "had only had dealings with David Chaffin, and I did not have the same level of confidence in Progressive."

Brandon Clements resigned from Progressive on February 3, 2020. In reviewing the computer he turned in, Progressive clicked on a browser logged into a Google Drive that Progressive does not use. Many Progressive files were found on this cloud drive, showed to be owned by Howard and shared with Clements, Smith, and McAlister at an AJL address. The Drive contained a trove of internal Progressive documents including files related to specific bids and proposals; internal spreadsheets showing costs that Progressive uses to establish pricing; a table showing identical scope of work and pricing in Progressive's and AJL's proposals to Malvern High School on the contracts Malvern rescinded; and quotes to El Dorado listing Chaffin and AJL dated January 13, the day before El Dorado told Progressive not to proceed on its contract.

On February 7, Progressive filed its five-count Complaint against Chaffin, Chaffin Holdings, AJL, Howard, and Clements alleging breach of the non-competition agreement, tortious interference with business expectancy, theft of trade secrets, and civil conspiracy. The district court held a two-day evidentiary hearing on February 19 and 25, 2020. At the end of the first day, with Brubaker's testimony not yet completed, AJL, Howard, and Clements settled, agreeing not to compete with Progressive or do business with Chaffin. The hearing continued. Progressive called Chaffin and Howard to testify after Brubaker, and introduced the eleven declarations. Howard testified he provided the Google Drive documents to Chaffin. Chaffin admitted he asked for and received internal Progressive documents from Clements.

On February 28, the district court granted Progressive's motion for preliminary injunction, applying the four factors a district court should consider. See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The court enjoined Chaffin and Chaffin Holdings from contacting or soliciting Progressive's customers; competing with Progressive's video security and installation business with Arkansas school districts within a 150 mile radius of Little Rock; violating the non-competition agreement; and destroying documents related to the lawsuit. The court reasoned that Progressive will suffer irreparable harm that

cannot be compensated by money damages because its school district business in Arkansas depends almost entirely upon customer relationships Chaffin built over many years and sold to Progressive. After his termination, Chaffin urged Progressive employees to leave the company and accompanied Howard to meetings at which they disparaged Progressive and solicited business from customers who quickly left Progressive for AJL.

The court concluded that Progressive is likely to succeed on the merits because the asset purchase agreement and the non-competition agreement, read together, are likely to be enforceable under Arkansas law. The court further concluded that "Progressive is also likely to succeed on its claims for tortious interference with a business expectancy and civil conspiracy." Progressive presented evidence "that former employees used their positions within Progressive to essentially steal information," and that customers then "switched video security providers . . . for basically the same deal with a different company, indicating the switch was not the result of fair market competition." The court discredited Chaffin's testimony that he was simply making introductions for AJL.

2. In reversing the preliminary injunction, the court primarily concludes the non-compete covenants are unenforceable and unreformable under Arkansas law because, unlike States that enforce restrictive covenants using what is commonly referred to as the "blue pencil" rule, Arkansas law in effect at the time of the events in question provided that "the contract must be valid as written, and the court will not apportion or enforce a contract to the extent that it might be considered reasonable." Bendinger v. Marshalltown Trowel Co., 994 S.W.2d 468, 473 (Ark. 1999); see Rector-Phillips-Morse, Inc. v. Vroman, 489 S.W.2d 1, 4 (Ark. 1973).

Progressive's breach of contract claim based on the non-compete covenants raises difficult issues extensively briefed and argued by the parties -- is the state-wide covenant geographically unreasonable; was the covenant tied to Chaffin's employment, not to the sale of his business, see Brown v. Devine, 402 S.W.2d 669, 671 (Ark. 1966) ("a 5-year restraint provision in contracts of employment is

-14-

unreasonable"); even if ancillary to the sale of Chaffin's business, is enforcing the covenant eleven and one-half years after the sale unreasonable; are the customer and employee solicitation clauses overly broad; did the covenant expire five years after Chaffin became an independent contractor in 2014? But in my view we need not (and should not) resolve them in deciding whether the district court abused its discretion in granting a *preliminary* injunction.

**A.** First, Chaffin's argument on appeal ignored, and the court pays scant attention to Progressive's claims of tortious interference with business expectancy and civil conspiracy.[8] "To establish a claim of tortious interference with business expectancy, [Progressive] must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." In addition, "the defendant's conduct [must be] at least improper." Stewart Title Guar. Co. v. Am. Abstract & Title Co., 215 S.W.3d 596, 601, 607 (Ark. 2005) (quotation omitted). "To prove a claim for civil conspiracy, one must show a combination of two or more persons . . . to accomplish some purpose, not in and of itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another." Born v. Hosto & Buchan, PLLC, 372 S.W.3d 324, 331 (Ark. 2010) (quotation omitted).

---

[8]The court's refusal to consider the tortious interference claim because Progressive's preliminary injunction motion did not cite that claim is, quite frankly, beyond my comprehension. The roles played by the settling defendants -- AJL, Hardy, and Clements -- explain Progressive's focus on the conspiracy claim at this early stage of the proceedings. As the court recognizes, a civil conspiracy claim *must* be based on an underlying tort. In Progressive's Complaint, the allegations in Count II, the tortious interference claim, are repeated almost word for word in Count IV, the civil conspiracy claim. Thus, the district court hardly abused its discretion in construing the preliminary injunction motion as being based on both tort claims.

Here, the evidence showed that Chaffin, in addition to violating his non-compete covenants, if they are enforceable, encouraged employees to leave Progressive because it was about to lose its Arkansas customers; told key Progressive customers that Progressive was in trouble with TIPS and likely would not survive; urged more than one customer to cancel contracts with Progressive; and acquired sensitive Progressive cost, pricing, and bid information that was stolen by Clements and used by AJL employees to prepare matching bids that induced Progressive customers to deal with AJL. Whether or not Chaffin was bound by the non-compete covenants, these actions would be chapter one in a playbook describing former employee unfair competition, if such a book existed. And Chaffin's knowing violation of the covenants, even if they prove to be unenforceable, establishes that he knowingly and intentionally used improper means that distinguish unfair from legitimate competition, in Arkansas and in most other jurisdictions.

For over fifty years, the Supreme Court of Arkansas has allowed "the recovery of damages from one who, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, at least where the means of inducement are tortious. See Restatement of Torts § 766 et seq., and Comments (1939)." Mason v. Funderburk, 446 S.W.2d 543, 546 (Ark. 1969). Though the American Law Institute has since rewritten § 766, "the controlling authority in Arkansas continues to be the Mason court's broad reading of what constitutes a business expectancy." Stewart Title, 215 S.W.3d at 612 (Imber, J., concurring) (citations omitted).

The district court was advised at the start of the second day of the preliminary injunction hearing that the settling defendants had agreed not to compete with Progressive or hire its employees for two years and not to have business contact with Chaffin for five years. Before resuming the hearing, the court expressed doubt that Progressive lacked an adequate remedy at law. But it then heard the testimony of Chaffin and Howard. The preliminary injunction order stated that the irreparable injury decision "was not easily made" and explained why the court concluded Progressive made a sufficient showing:

-16-

Chaffin's own testimony indicates that money damages are inadequate. Chaffin testified that he told Paul Stinson to leave Progressive and find another job because Progressive was about to feel the pain. This testimony could be viewed merely as a statement of fact because Chaffin believes Progressive is going to lose business due to [a TIPS] audit that it is undergoing, but this point of view makes no sense. Chaffin appears insulted and highly upset that Progressive fired him. . . . Chaffin testified that he was not paid for his work at AJL. All of this suggests a broader truth about this case: Chaffin's actions are not just about money, and to let him continue competing with Progressive will result in Progressive's destruction. No amount of money can make that right.[9]

Arkansas law reflects this principle. In determining whether interference with customer relations is tortious, the critical question is whether the interference is done "maliciously and without justifiable cause," the term malice in this context meaning "the intentional doing of a harmful act without justification or excuse." Mason, 446 N.W.2d at 546 (quotation omitted). Likewise, the tort of civil conspiracy imposes liability "where the conspiracy has an 'unlawful purpose' or where the participants use 'unlawful means.'" Developments in the Law -- Competitive Torts, 77 Harv. L. Rev. at 929.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959). These are findings of fact we review for clear error. Medtronic, Inc. v. Gibbons, 684 F.2d 565, 569 (8th Cir. 1982) (affirming a preliminary injunction enforcing a restrictive covenant in an employment contract). Here, the court concludes, "Progressive's *failure to show* irreparable harm on this tortious interference claim bars preliminary injunctive relief." *Ante* p.8 (emphasis added). Not only does this usurp the district court's fact-finding prerogative, it is

---

[9]That malice alone can be the basis of tort liability for conduct that would otherwise be lawful competition has deep common law roots. See Developments in the Law -- Competitive Torts, 77 Harv. L. Rev. 888, 924-25 (1964), discussing the case of Tuttle v. Buck, 119 N.W. 946 (Minn. 1909).

contrary to the overwhelming weight of authority. "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994); see generally 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2022) and cases cited at n.21. As the Supreme Court of Arkansas said in a comparable situation, an injunction is "the only realistic relief." Bailey v. King, 398 S.W.2d 906, 908 (Ark. 1966). The court's treatment of this issue is superficial at best.

On this record, I conclude the district court did not commit an error of law or abuse its discretion in concluding that Progressive's tort claims have a substantial likelihood of success on the merits, and that Progressive was threatened with irreparable injury through the loss of its business in Arkansas. By limiting the preliminary injunction to "Arkansas school districts within a 150 mile radius of Little Rock" -- where Chaffin testified he generally does business -- the court appropriately tailored Chaffin's promises in the non-competition agreement in fashioning appropriate preliminary injunctive relief for the tort claims. We have previously upheld a non-compete covering a 200-mile radius around Little Rock. See Owens v. Penn Mut. Life Ins. Co., 851 F.2d 1053, 1055 (8th Cir. 1988) (applying Arkansas law). I know of no Arkansas case holding that it violates the no-blue-pencil rule to limit *preliminary injunctive* relief to what is needed to preserve the status quo pending determination of whether the covenants are reasonable.

**B.** Although I do not disagree that enjoining Chaffin from "violating the non-compete agreement with Progressive" may be too broad as written, I strongly disagree with the court's declaration at this stage of the proceedings that the covenants "are unenforceable." *Ante* p.7. The burden is on the party challenging a covenant to show it is unreasonable and against public policy. Reasonableness is a question of fact; the trial court's factual findings will not be reversed unless clearly erroneous. Madison Bank & Trust v. First Nat'l Bank of Huntsville, 635 S.W.2d 268, 271 (Ark. 1982) (citing cases). To be reasonable, a non-compete must be

"ancillary to a contract of employment or to a contract for the transfer of goodwill or other property." Dawson v. Temps Plus, Inc., 987 S.W.2d 722, 726 (Ark. 1999).

First, whether the covenants were ancillary to Chaffin's employment, or to the sale of his business, is a difficult *issue of fact that is ultimately reviewed for clear error*. The non-competition agreement was an essential element of an asset purchase agreement in which most of the purchase price was paid for valuable goodwill created by Chaffin's customer relationships. "[W]here goodwill has, for valid consideration, been transferred . . . the purchaser has a legitimate pecuniary interest in protecting against its being drained by competition from the seller." Duffner v. Alberty, 718 S.W.2d 111, 114 (Ark. Ct. App. 1986); see Hyde v. C M Vending Co., 703 S.W.2d 862, 864 (Ark. 1986). Chaffin then became a Progressive employee and used his customer relationships to further Progressive's interests for over six years, earning an additional $1.5 million in commissions and, Progressive contends, extending the start of his five-year sale-of-business restrictive covenants. To my knowledge, no Arkansas appellate court decision has addressed whether this type of "hybrid" covenant situation is subject to the "stricter scrutiny" given employment covenants. The answer is far from obvious.[10] Whether the five-year covenants are unreasonably long may well turn on that answer. "The reasonableness of duration of a covenant not to compete after sale of a business is to be judged in the light of accompanying circumstances." Hyde, 703 S.W.2d at 864; see Madison Bank, 635 S.W.2d at 271 (enforcing ten-year non-compete covenant as "essential . . . consideration" in the purchase of the business); Dawson, 987 S.W.2d at 727 ("there is nothing inherently unreasonable about a five-year duration restriction").

Chaffin's further contention that the five-year covenant expired when he became an independent contractor in 2014 does not warrant reversing the

_____

[10]In Goff v. Arthur J. Gallagher & Co., No. 6:19-CV-06130, 2020 WL 2199000, at *4-6 Mem. Op. & Order (W.D. Ark. May 6, 2020), the court upheld as reasonable and enforced a five-year non-compete covenant contained in an employment agreement that was contemporaneous with an asset sale transaction in which the employee sold his company's goodwill and other assets to the employer.

preliminary injunction. First, this issue turns on the meaning of the termination provisions in the asset purchase and non-competition agreements, which expressly stated that Chaffin would covenant not to compete "for a period of five years . . . after the later of . . . the end of [his] employment *or any consulting contract with [Progressive]*." (Emphasis added). Second, the district court found this argument to be contrary to the conduct of the parties. Prior to termination, Chaffin held himself out as a Progressive employee; after termination, he told Progressive employee Stinson, "I was fired."

Second, the court again usurps the district court's fact-finding and enforcement functions when it declares that the customer-solicitation restriction "unreasonably prohibits Chaffin from contacting prospective customers with whom Chaffin had no contact." *Ante* p.6. A restrictive covenant may validly protect an employer's stock of customers from misappropriation by a former employee who "builds up personal relationships that bind the customers to himself instead of to the employer's business." Borden, Inc. v. Huey, 547 S.W.2d 760, 761 (Ark. 1977). The customer-solicitation clause applies to communications for the purposes of Video Security Sales or terminating relationships with Progressive. The employee-solicitation clause seems reasonably necessary to protect against the kind of unfair competition that has already occurred in this case. These are serious, fact-intensive issues that likely require a full-blown trial to resolve. Moreover, even if the covenants are found to have expired or are unenforceable, I would affirm the preliminary injunction pending resolution of Progressive's tort claims.

In summary, I conclude the district court did not err or abuse its discretion in concluding that Progressive made a sufficient showing of likelihood of success on the merits of its tort claims and at least a portion of its breach of non-compete covenant contract claims to satisfy this Dataphase factor, properly construed. I would not disturb the district court's irreparable-harm and balance-of-harms findings. Regarding the public-interest factor, the district court reasonably concluded:

-20-

Finally, an injunction is in the public's interest. The public has an interest in the enforcement of fairly-negotiated business agreements. There are plenty of approved vendors that can ensure Arkansas public schools will receive competitive prices. Additionally, if Progressive's business were to be substantially undermined by unlawful competition, it could hurt the livelihood of Progressive's many employees.

I would affirm the order of the district court dated February 28, 2020. The court disagrees. Hopefully, the time the preliminary injunction has been in place, combined with the commitments made by the other defendants in settling, have enabled Progressive to restaff its Arkansas operations and maintain a viable portion of its Arkansas school district business. If not, and the case proceeds to trial, the damages that may be awarded against Chaffin and Chaffin Holdings for their tortious interference with contracts and business expectancies could indeed be substantial.

_____