

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–15–203

| | |
|---|---|
| RICHARD BURLEIGH<br>APPELLANT | **Opinion Delivered** October 28, 2015 |
| V. | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. CV2014-1751-4] |
| CENTER POINT CONTRACTORS, INC.<br>APPELLEE | HONORABLE JOHN R. SCOTT, JUDGE<br><br>REVERSED AND REMANDED |

## CLIFF HOOFMAN, Judge

Appellant Richard Burleigh appeals from the Benton County Circuit Court's February 10, 2015 order granting a preliminary injunction in favor of appellee Center Point Contractors, Inc. (Center Point). On appeal, Burleigh contends that (1) the noncompete agreement was intended to protect only against ordinary competition and is therefore unenforceable and (2) the circuit court's additional protections in the preliminary injunction that were not present in the noncompete agreement show that the agreement was unreasonable and not valid as written. We reverse and remand.

On December 30, 2014, Center Point filed a complaint alleging that Burleigh breached his duty of loyalty to Center Point when he worked on a project for Jeff Wolfe and that Burleigh breached the noncompete agreement that he signed with Center Point. Center Point also sought a preliminary injunction. A copy of the employee noncompete and confidentiality agreement, which was attached to the complaint, specifically stated the



following in pertinent part:

> 1.  Agreement Not to Compete: While I am employed by the company, and 2 years afterward, I will not compete with the business of the Company or its successors and assigns, within a radius of 50 miles from the present locations of the Company (10316 East Highway 72, Bentonville, AR 72712).  I will not directly or indirectly, as an owner, director, employee, independent contractor, consultant, representative, or in any other capacity, engage in activities competitive to the Company in business substantially similar to the present of the Company or such other business activity in which the Company may substantially engage while I'm employed by the Company.
>
> In particular, I will not:
> > A) Solicit or attempt to solicit any business or trade from the Company's actual or prospective customers or clients on behalf of myself or any other person, firm, partnership, corporation or other entity competitive to the Company.
> > B) Solicit or attempt to solicit any existing Company employee for the purpose of said employee leaving the Company's employment and working for any customer or competitor, or
>
> 2.  Confidentiality. I acknowledge that the Company, in reliance of this agreement, may provide me with access to trade secrets, customers, proprietary data and other said information on my own behalf or disclose same to any third party, except when I am required to do so to properly perform my duties to the Company.
>
> . . . .
>
> 4.  Injunctive Relief.  I acknowledge and agree that in the event of a violation or threatened violation of any provision of this agreement, the Company will sustain irreparable harm and will have full right to seek injunctive relief, in addition to any other legal remedies available, without the requirement of posting bond.
>
> . . . .
>
> 6.  Governing Law.  The formation, construction and interpretation of this agreement shall at all times and in all respects be governed by the laws of the State of Arkansas.

Burleigh filed his answer and a motion to dismiss on January 29, 2015.  After Center Point filed its response to the motion to dismiss, the circuit court orally denied Burleigh's motion to dismiss and held a hearing on the preliminary injunction on February 2, 2015.

2

SLIP OPINION

At the hearing, Shelli McDaniel testified that she owned Center Point, which was a general commercial construction company. She explained that Burleigh was hired in March 2012 as the operations manager and estimator in an effort to expand her business in steel fabrication. She further admitted that Center Point did not provide Burleigh any specialized training in this area but relied on his previous expertise in the construction industry and on his existing contacts with general contractors in Northwest Arkansas. The only training that he would have received "would've been how things were done in [Center Point's] office, how [Center Point] proceeded with doing bids, how [Center Point] did [its] contracts, how [it] did [its] record keeping, that -- that type of things. [Shelli] did not train him on how to do his job." Shelli also admitted that Center Point did not use any specialized proprietary software or formulas to bid on jobs, but it used templates after general contractors sent invitations to bid to local subcontractors, including Center Point. According to Shelli, the noncompete agreement prohibited Burleigh from "any activity [that was] competitive" with Center Point for a period of two years, and she desired to have Burleigh prohibited from bidding on any projects on which Center Point also bid. She admitted on cross-examination that she believed that the agreement prohibited any competition regardless of "whether or not it was unfair competition, using some information he learned from [Center Point], or just generally fair competition, responding to invitations to bid."

Chris McDaniel, Shelli's husband and an officer with Center Point, testified that he had been involved in the decision to hire Burleigh. Chris further explained that he believed that Burleigh could engage in any commercial construction to the extent that it would not be in

direct competition with Center Point. Although Chris stated, "I believe that there's activities that he gained and gleaned from our company during the course of two years that he was there that if he takes and uses that at another company, then he has an unfair advantage in his bidding process over us," he openly admitted that he did not think Center Point taught Burleigh how to bid on steel work and that he assumed that Burleigh used his own formulas when placing bids for Center Point. Additionally, he explained that Center Point's customer list was generated by a subscription service, Datafax, and that anyone who had the ability to qualify for a particular job would be able to find the jobs that were available for bidding using that service.

Richard Burleigh testified that he was hired by Center Point and began working in March 2012. He explained that he had expanded Center Point's business during his tenure, but his employment with Center Point ended in October 2014. He also denied that Center Point provided him with any training, proprietary formulas, trade secrets, or a secret customer list. Furthermore, he testified that he did not believe that he had learned anything at Center Point that would give him an unfair advantage in the bidding process against it.

Burleigh testified that he had approximately fourteen years of experience in many areas of construction, including concrete, steel, underground utilities, paving, engineering, design, project management, estimating, personnel management, and organization of various trades and projects. He additionally explained that his experience was gained in northwest Arkansas and that he would be unable to move to any other area due to his family and due to the lack of contacts, experience, and reputation in any other area. Therefore, he testified that he had

entered into an agreement with a friend to form KB Structural, which was another construction company. He admitted that he had already solicited several bids for construction work on behalf of KB Structural, including work in concrete, masonry, and steel erection, from general contractors.

The circuit court filed a written order granting the preliminary injunction on February 10, 2015. The circuit court specifically found that

> Plaintiff's request for a preliminary injunction is supported by the evidence. Defendant has knowledge of Plaintiff's operations. The time and geographic restrictions contained within the parties' Employee Non-Compete and Confidentiality Agreement are not unduly burdensome. There is a strong likelihood that Plaintiff will prevail on the merits of its claim against Defendant. A preliminary injunction should issue.

The circuit court added additional terms and conditions in granting the preliminary injunction. It enjoined Burleigh from "engaging in any business activities that compete with the types of business activities that Plaintiff substantially engaged in before 31 October 2014." It further ordered Burleigh to notify Center Point in writing regarding any prospective business activity that he wished to engage in that could arguably violate the circuit court's order. Center Point was required to (1) respond within fourteen days after receiving any written notice from Burleigh, (2) provide a copy of the bid or proposal it intended to submit, and (3) to in fact submit such a bid or proposal to the prospective client. Finally, the circuit court required Center Point to post a $50,000 bond pursuant to Arkansas Rule of Civil Procedure 65(c). This timely appeal followed.

Arkansas Rule of Appellate Procedure–Civil 2(a)(6) (2015) allows a party to appeal an interlocutory order by which an injunction is granted, continued, modified, refused, or

SLIP OPINION

dissolved, or by which an application to dissolve or modify an injunction is refused. In determining whether to issue a preliminary injunction or a temporary restraining order pursuant to Arkansas Rule of Civil Procedure 65, the circuit court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving party has demonstrated a likelihood of success on the merits. *Potter v. City of Tontitown*, 371 Ark. 200, 264 S.W.3d 473 (2007). The test for determining the likelihood of success on the merits is whether there is a reasonable probability of success in the litigation. *Freeman v. Brown Hiller, Inc.*, 102 Ark. App. 76, 281 S.W.3d 749 (2008). Consideration of this issue will require determining whether the requirements for a noncompete agreement were met. *Id.* Furthermore, we review a circuit court's ruling on a request for a preliminary injunction under an abuse-of-discretion standard. *Potter*, *supra*.

Burleigh first contends that the noncompete agreement was intended to protect only against ordinary competition and is therefore unenforceable, which challenges the circuit court's finding that Center Point demonstrated a likelihood of success on the merits to warrant a preliminary injunction. Essentially, appellant argues that the non-compete agreement was void and unenforceable because it violates the public policy of this state which prohibits unreasonable restraints of trade. We agree.

Covenants not to compete are not looked upon with favor by the law. *Moore v. Midwest Distrib., Inc.*, 76 Ark. App. 397, 65 S.W.3d 490 (2002). A party challenging the validity of a covenant not to compete must show that it is unreasonable and contrary to public policy. *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 994 S.W.2d 468 (1999). In order

6

for a noncompete agreement to be valid, the following three requirements must be met: (1) the covenantee must have a valid interest to protect; (2) the geographical restriction must not be overly broad; and (3) a reasonable time limit must be imposed. *Freeman*, *supra*. However, an employer may not shield itself from ordinary competition. *Import Motors, Inc. v. Luker*, 268 Ark. 1045, 599 S.W.2d 398 (Ark. Ct. App. 1980). The test of reasonableness of contracts in restraint of trade is that the restraint imposed upon one party must not be greater than is reasonably necessary for the protection of the other and not so great as to injure a public interest. *Moore*, *supra*. Appellate courts have viewed noncompete agreements differently based on whether they grow out of an employment relationship or whether they are made in connection with the sale of a business, and noncompete agreements in employment contracts are subject to stricter scrutiny than those connected with a sale of business. *Freeman*, *supra*. Where a noncompete agreement grows out of an employment relationship, appellate courts have found an interest sufficient to warrant enforcement of the agreement only in those cases where the employer provided special training, or made available trade secrets, confidential business information, or customer lists, and then only if it is found that the employee was able to use the information so obtained to gain an unfair competitive advantage. *Moore*, *supra*.

In the present case, Center Point's owner and officer testified that Burleigh was not provided with any special training. In fact, Center Point relied on Burleigh's expertise in steel construction in order to expand its business. Shelli admitted that Center Point did not use any specialized proprietary software or formulas, and Chris admitted that he assumed that Burleigh used his own formulas when placing bids for Center Point. Additionally, Chris

7

explained that Center Point did not maintain a special customer list and that anyone that had the ability to qualify for a particular job would be able to find the jobs that were available for bidding. Furthermore, Burleigh testified that Center Point did not provide him with any training, proprietary formulas, trade secrets, or a secret customer list. Rather, he maintained that he did not learn anything at Center Point that would give him an unfair advantage in the bidding process against it. As such, Center Point did not have a legitimate interest to be protected by the agreement, and the non-compete agreement only shielded Center Point from ordinary competition. Therefore, the circuit court erred in granting a preliminary injunction because Center Point failed to demonstrate a likelihood of success on the merits, and we reverse and remand. Because we find that the circuit court erred in granting the preliminary injunction, it is unnecessary to address Burleigh's second point on appeal.

Reversed and remanded.

VIRDEN and KINARD, JJ., agree.

*Mertins Law Firm, PLLC*, by: *William Mertins*, for apellant.

*Stephen Lee Wood, P.A.*, by: *Stephen Lee Wood*, for appellee.

SLIP OPINION