Cite as 2022 Ark. App. 231

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-21-258

| | |
|---|---|
| CHANCE COMBS AND PRESTON LONG | Opinion Delivered May 18, 2022 |
| APPELLANTS | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CV-21-671] |
| V. | |
| ELITE TITLE COMPANY, INC. APPELLEE | HONORABLE DOUG MARTIN, JUDGE |
| | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

This is an interlocutory appeal of an amended preliminary injunction enjoining appellants Chance Combs and Preston Long from conducting similar business as their former employer, appellee Elite Title Company ("Elite").[1] Appellants assert that we should apply common-law principles because the parties' agreement predated the relevant 2015 statute and should thereby find that the noncompete provision is unenforceable in its entirety because (1) there is no valid protectable interest of the employer since the agreement merely protects against ordinary competition; (2) the circuit court is prohibited from enforcing the agreement other than as specifically written under common-law standards; and

---

[1]Such an interlocutory order is specifically appealable pursuant to Ark. R. App. P.–Civil 2(a)(6) (2021), which provides for an interlocutory appeal of an order "by which an injunction is granted, continued, modified, refused, or dissolved[.]"

(3) the covenant is overly broad geographically because it includes areas outside those of Elite's trade area. We disagree and affirm.

Elite is a title company that has been in business since 1994. It is headquartered in Springdale with two other offices in Northwest Arkansas and a single office located in Oklahoma. Elite was founded and is owned by Carla Burg. Elite is differentiated from other title companies because of its trade secrets. One of Elite's confidential trade secrets is its title plant. The title plant is a proprietary-software program owned by Elite that indexes the first deed that is filed of record in the county and goes forward to the present. It allows Elite to conduct searches quickly and efficiently. Elite maintains it is one of its largest assets with a seven-figure value.

Elite markets its title plant and the availability of those services to customers on its website. Elite does not let other title companies use its title plant. Appellant Combs admitted that the database containing the title plant could be considered a trade secret. Elite requires employees to keep information about the title plant confidential, and they must have a password to access the title plant. Elite's pricing and customers are also Elite's confidential trade secrets.

Elite's customer relationships are Elite's property. Employees must log in with a password to be able to access the customers' files and paperwork. Elite has a policy and procedure manual ("Manual") that requires employees to keep Elite's confidential information and trade secrets confidential. The Manual includes instruction about employees maintaining passwords.

2

Elite also requires employees to sign a confidentiality and noncompetition agreement when they are hired to protect Elite and its confidential trade secrets. In March 2013, Elite hired appellant Long to work as a closing coordinator, and he eventually became a closing agent. Long was Ms. Burg's stepson for many years. As part of his employment, Long entered into a confidentiality and noncompetition agreement with Elite. Long had no prior experience in the title business. All of his training in the title business and how to be a closing agent was provided by Elite.

Long was later promoted to lead the closing team as head of the closing department. Elite paid Long an $80,000 salary and also paid for his house and truck. Long had responsibility and signature authority over the escrow account, which is the biggest account at any title company. Elite maintains that Long was in a position of authority and trust as head of the closing department.

In April 2015, Elite hired appellant Combs to serve as in-house legal counsel after he had graduated from law school. After failing the bar exam, Elite trained Combs in the title department and helped him obtain his title-agent license. A year later, Combs passed the bar exam and became Elite's in-house counsel in addition to being a title agent. As part of his employment, Combs entered into a confidentiality and noncompetition agreement with Elite. Combs had no prior experience working in the title business. Elite provided Combs all his training, including how to work for a title company, performing closings, and drafting deeds. Long was Combs's immediate supervisor.

Combs also managed Elite's 1031 transactions.[2] Twenty years ago, Elite formed Like-Kind Exchange, LLC ("Like-Kind"), to handle 1031 exchanges for Elite's customers. Like-Kind generates fees of a few hundred dollars per transaction for acting as the qualified intermediary during the 1031 exchange and then Like-Kind pays the fee to Elite's operating account. As Elite's general counsel, Combs was appointed manager of Like-Kind to handle customers' 1031 transactions. Combs was given signature authorization for the Like-Kind bank account.

Combs and Long each were head of their departments and had significant knowledge of all of Elite's trade secrets and how Elite is run. They had access to Elite's title plant and pricing. Appellants had to log in with a password to be able to access the customers' files and paperwork.

Both appellants agreed to sign and did sign the confidentiality and noncompetition agreements ("Agreements"), which prohibit employees of Elite from working for a direct competitor of Elite and/or soliciting current and former customers of Elite during their employment and for a period of two years after their employment ends. The Agreements also prohibit using or disclosing Elite's confidential information and trade secrets. Section 4(b) of the Agreements contains a severability clause. The Agreements are geographically limited to the counties surrounding Elite's offices in Washington County and Benton County and the office located in Oklahoma.

---

[2]A 1031 exchange is a real estate investing tool that allows investors to exchange one investment property for another and defer capital gains or losses.

On January 11, 2021, appellants resigned, but they offered to remain on staff for an additional two weeks if Ms. Burg would continue paying them their $80,000 salaries and pay each of them an additional $10,000. Ms. Burg declined their offer. Shortly thereafter, Elite discovered appellants were working for a competitor called Apex Title in Rogers, Arkansas. Apex Title was located only in Oklahoma, but it opened a Rogers location around October 8, 2020. Combs had a 10 percent ownership interest in the Apex Rogers location, and Long had a 30 percent ownership interest.

Long testified that he began discussions with Apex about going to work for the company in the late summer of 2020. After appellants resigned from Elite, significant Elite business was being transferred to Apex Title. Elite also discovered that on October 1, 2020, Combs had created a separate 1031 exchange company called 1031 Intermediary Services, LLC--while he was still employed by Elite as its general counsel. Also while still employed as general counsel, Combs used the new company for at least three transactions instead of using Like-Kind. Elite alleges that through these 1031 transactions, Combs stole approximately $2,500 in fees that were the property of Elite while still employed as its general counsel. Combs also used Elite's proprietary forms in processing these transactions through the new company while still employed as Elite's general counsel.

Appellants admitted they violated the noncompetition agreements. Elite sought the injunction as a result of the violations of the Agreements and to protect Elite's trade secrets. After a hearing held on April 15, 2021, the circuit court found that the appellants lacked credibility--specifically, the court could not take them at their word, and the appellants'

5

testimony conflicted with one another. The circuit court rejected appellants' argument that the Agreements' only purpose was to prevent ordinary competition in the title business and granted the relief of preliminary injunction.

The circuit court entered its preliminary injunction on May 3, 2021, which was amended by a joint motion to correct a typographical error on June 1, 2021. The amended preliminary injunction states: "The Court finds Elite has a protectable interest in its pricing strategies, customer lists, customer relationships and its title plant. The Agreement is reasonable with regard to its two (2) year term and its geographic scope. Therefore, the Agreements are valid and enforceable." The amended preliminary injunction further states:

> The risk of irreparable harm is supported by the transfer of client business from Elite to Defendants. A likelihood of success on the merits is supported by the Defendants' admissions regarding their violations of the terms of the Agreements, evidence demonstrating diversion of 1031 funds and clients during Defendants' employ with Elite, and testimony regarding business moving from Elite to Apex.

The amended preliminary injunction enjoined the appellants from the following activities in Washington and Benton Counties and the contiguous counties during the duration of this litigation or until January 11, 2023, whichever is earlier: (1) employment with Apex or any other title company; (2) ownership (if more than 5 percent equity interest) in Apex or other title company if Apex is employing any former key Elite employee; (3) interference with any relationship, contractual or otherwise, between Elite and any current or former customer or affiliate; (4) use of any forms or documents obtained during defendants' employ with Elite Title; and (5) disclosure of pricing, customers lists, or any

6

other trade secrets or confidential or proprietary information obtained through their employ with Elite Title.[3] This interlocutory appeal is now properly before us.

Decisions to grant or deny an injunction are reviewed for an abuse of discretion, but we give the circuit court's interpretation of law no deference. *United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 2014 Ark. 517, 451 S.W.3d 584. An injunction may be granted if the petitioner shows (1) that it is threatened with irreparable harm; (2) that this harm outweighs any injury that granting the injunction will inflict on other parties; (3) a likelihood of success on the merits; and (4) that the public interest favors the injunction. *United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 353 Ark. 902, 120 S.W.3d 89 (2003).

The sole question before our appellate court is whether the circuit court departed from the rules and principles of equity in entering the order and not whether the appellate court would have made the order. *Mounce v. Jeronimo Insulating, LLC*, 2021 Ark. App. 195, at 7, 625 S.W.3d 367, 372. "The test for determining the likelihood of success on the merits is whether there is a reasonable probability of success in the litigation. Consideration of this issue will require determining whether the requirements for a noncompete agreement were met." *Burleigh v. Ctr. Point Contractors, Inc.*, 2015 Ark. App. 615, at 6, 474 S.W.3d 887, 891. "The burden is on the party challenging the covenant to show that it is unreasonable. . . .

---

[3]During the pendency of this appeal, appellants have been found in contempt for violating the preliminary injunction.

7

Covenants not to compete are reviewed on a case-by-case basis." *Mounce*, 2021 Ark. App. 195, at 9, 625 S.W.3d at 373.

Appellants first claim that the Agreements are "invalid as overly broad since it only prohibits ordinary competition and does not cover a legitimate business interest." Appellants do not argue that Elite does not have valid interests to protect in its customers or customer lists. Rather, they argue that the Agreements are overly broad and prohibit ordinary competition because they "are not narrowly tailored just to protect Elite's existing customer base, or its confidential information." Appellants claim that Elite's title plant and pricing information are not protectable business interests.

However, appellants fail to cite any authority or convincing legal argument for their baseless assertion that Elite's title plant and pricing plans are not protectable interests. Instead, they cite and rely on *Rebsamen Insurance v. Milton*, 269 Ark. 737, 744, 600 S.W.2d 441, 444 (1980) (holding "[t]hey have failed to prove possession of trade secrets in its business."); and *Girard v. Rebsamen Insurance Co.*, 14 Ark. App. 154, 157, 685 S.W.2d 526, 528 (1985) (holding "[w]hile we agree with appellant that no trade secrets were shown to exist in appellee's business, the appellee's proof did show that its customer list and related information were protected interests."). These authorities are not applicable here. We agree with Elite that protectable interests exist when an employer's confidential information or trade secrets are at issue. *See Burleigh*, 2015 Ark. App. 615, at 7, 474 S.W.3d at 891.

The evidence presented at the preliminary-injunction hearing and the relevant case law clearly supports that the circuit court did not abuse its discretion in finding that, in

addition to its customer relationships and customer lists, Elite has a protectable interest in its pricing strategies and title plant. Appellants' claims, that Elite's information is readily ascertainable by the public and that Elite takes no steps to protect the privacy of this information, are refuted by the record. Elite's founder and owner, Ms. Burg, testified that she was asking for the injunction to protect Elite's trade secrets with regard to the customer lists, title plant, and pricing information, and Elite requires its employees to sign confidentiality agreements.

Appellants were each head of their respective departments and had significant knowledge of all of Elite's trade secrets and how Elite is run. Combs, a licensed Arkansas attorney, was Elite's in-house general counsel and owed it fiduciary duties. Long was also in a position of authority and trust as head of the closing department. All their title-industry training was provided by Elite. The record demonstrates the value of Elite's confidential information and trade secrets. Appellant Combs admitted that the database containing the title plant could be considered a trade secret.

Elite's Manual requires employees to keep Elite's confidential information and trade secrets confidential. The Manual states, "Confidentiality is taken very seriously at Elite Title Company, Inc. Due to the nature of our work, you may come in contact with personal information of customers, proprietary company data, company procedures, etc. This type of information is not to be discussed with anyone outside of Elite Title Company, EVER."

The Manual also includes instruction about employees maintaining passwords. Elite's trade secrets or confidential information is not readily ascertainable by members of the

general public or generally known by those in the industry, and Elite takes many steps to protect the privacy of this information. Clearly, Elite has protectable interests in its pricing strategies and title plant, in addition to its customer lists and customer relationships, to support enforcement of the Agreements. Therefore, we hold that the circuit court did not abuse its discretion in finding that Elite "has a protectable interest in its pricing strategies, customer lists, customer relationships and its title plant."

Appellants also argue that the Agreements and the preliminary injunction are overly broad. We disagree. The case law dealing with noncompete agreements, protecting an employer's confidential information, and trade secrets provided to employees during the course of their employment do not require the Agreements to be restricted to Elite's current customers and clearly support the circuit court's ruling in this case. *See Statco Wireless, LLC v. Sw. Bell Wireless, LLC*, 80 Ark. App. 284, 291, 95 S.W.3d 13, 16 (2003); *Freeman v. Hiller, Inc.*, 102 Ark. App. 76, 77, 281 S.W.3d 749, 751 (2008).

"The enforceability of a covenant not to compete depends upon its reasonableness in light of the particular facts of the case." *Milton*, 269 Ark. at 742, 600 S.W.2d at 443. "A reasonably drawn covenant not to compete is an effective means by which a principal may protect its customers and its confidential information from appropriation and use by former agents or competitors." *Statco*, 80 Ark. App. at 299, 95 S.W.3d at 22.

In *Statco Wireless*, Statco argued that the noncompete agreement was overly broad. The covenant not to compete prohibited Statco, for a period of one year after termination, from inducing customers to choose the services of a competitor of Southwestern Bell or

otherwise sell or promote services offer by competitors of Southwestern Bell. *Id.* at 296, 95 S.W.3d at 19–20. Our court held, "We do not find the trial court's conclusion to be clearly erroneous because, although the covenant is broadly drawn, it is not unreasonably so." *Id.* at 297, 95 S.W.3d at 20.

Like the appellants in this case, part of Statco's argument was that "the covenant precludes Statco personnel, even as stockholders, from engaging in the sale or promotion of a competitor's service" and "that the covenant does not merely prevent solicitation of SWBW customers but prohibits Statco from directing any potential customer to another service provider." *Id.* at 298, 95 S.W.3d at 21. The *Statco* court addressed this argument first stating, "We interpret the covenant as being aimed at protecting three SWBW interests: (1) keeping its customers from being appropriated by a former agent; (2) keeping the confidential information possessed by its agent from falling into the hands of a competitor; and (3) protecting its name, goodwill, and assets." *Id.* at 298, 95 S.W.3d at 21.

In the present case, the circuit court rejected appellants' argument that the Agreements are not reasonable because the only purpose is to prevent ordinary competition in the title business. The circuit court stated, "I don't find that these covenants not to compete . . . are unreasonable or that they are solely for the purpose of preventing either one of these defendants from working in the industry." We cannot say the circuit court erred.

Appellants also claim that since the Agreements were entered prior to 2015, common law applies, which prohibits blue penciling, or editing, of the Agreements. However, Appellants do not point to anywhere in the record that the circuit court "blue penciled" the

noncompete agreements. Whether Arkansas Code Annotated section 4-75-101 applies to the Agreements in this case is immaterial to this appeal because the Agreements are valid and enforceable as written. While the court may not "blue pencil" the Agreements under the 2015 statute, the severability clauses in the Agreements provide authority, regardless of any statutory provision, to construe the agreements in a manner that could be upheld under the law. *See Mounce*, 2021 Ark. App. 195, at 9, 625 S.W.3d at 373.

In *Mounce*, an insulation company sued its former employee and moved for a temporary restraining order for breach of a noncompete and nondisclosure agreement and misappropriation of trades secrets due to the employee's siphoning off the employer's customer and related jobs. *Id*. at 3, 625 S.W.3d at 370. "The agreement contained a severability clause permitting excision of any provision or part judicially determined to be illegal, invalid, or unenforceable so that the remainder of the agreement would be fully valid, legal, and enforceable." *Id*. at 2, 625 S.W.3d at 369.

In response to Mounce's argument that the common law does not permit a court to "blue pencil" a noncompete executed prior to 2015 and that the court committed error by paring down the agreement in the temporary restraining order, the court stated, "Mounce does not point to anywhere in the record that the circuit court 'blue penciled' the non-compete agreement." *Id*. at 9, 625 S.W.3d at 373. The appellate court then held, "We find Mounce's appellate arguments without merit and hold that Mounce has not demonstrated reversible error." *Id*. at 8, 625 S.W.3d at 372.

The court further held, "We hasten to add that the agreement itself contains a severability clause, so the parties agreed to permit reformation of this non-compete agreement to any extent necessary to make it enforceable under the law." *Id.* at 9, 625 S.W.3d at 373. "This severability clause, which these parties agreed to, provides authority within this contract, regardless of any statutory provision, to construe this agreement in a manner that could be upheld under the law. This supports the circuit court's 'likelihood of success on the merits' ruling." *Id.*

In this case, as in *Mounce*, section 4(b) of the Agreements contains severability clauses in which the parties agreed to permit reformation of the noncompete provisions to any extent necessary to make it enforceable under the law. The plain terms of the Agreements provide that in the event a court should find the scope of any part of the Agreements unreasonable, it shall be reformed by that court to be reasonable. The circuit court does not need Arkansas Code Annotated section 4-75-101 to reform the Agreements because it was given express authority by the Agreements themselves. *Mounce, supra*.

Appellants also claim that the Agreements are "invalid and unenforceable because the scope of its geographic restriction is unreasonably broad." Where a geographic restriction is greater than the trade area, the restriction is too broad and the covenant not to compete is void. *Moore v. Midwest Distribution, Inc.*, 76 Ark. App. 397, 65 S.W.3d 490 (2002). The burden is on the party challenging the covenant to show that it is unreasonable. *Mounce, supra*. Here, appellants failed to offer testimony or evidence on the extent of Elite's trade area. Moreover, appellants fail to cite to anything in the record to support that the circuit

court abused its discretion. "We have held repeatedly that the burden is on the appellant to bring up a record sufficient to demonstrate that the trial court was in error. When the appellant fails to meet that burden, we have no choice but to affirm the trial court." *Troutt v. Matchett*, 305 Ark. 474, 476, 808 S.W.2d 777, 778 (1991). Accordingly, we affirm the circuit court's finding that the Agreements are reasonable with regard to its geographic scope.

For all the reasons outlined above, we hold that the circuit court did not clearly err in finding that Elite has a protectable interest in its pricing strategies, customer lists, customer relationships, and title plant; that the Agreements are reasonable with regard to the geographic scope; and that the Agreements are valid and enforceable. The circuit court did not abuse its discretion in holding that Elite demonstrated a likelihood of success on the merits of its complaint and irreparable harm in the absence of the preliminary injunction. Thus, we affirm.

Affirmed.

KLAPPENBACH and BROWN, JJ., agree.

*Taylor Law Partners, LLP*, by: *Rick Woods* and *Nick Mote*, for appellants.

*Clark Law Firm PLLC*, by: *Suzanne G. Clark* and *Payton C. Bentley*, for appellee.